2025 IL App (1st) 242274

FIRST DISTRICT,
SIXTH DIVISION
May 9, 2025

No. 1-24-2274

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| *In re* Jo. P., Jos. P., Jose. P., and L.P., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County, Illinois |
| (The People of the State of Illinois, | ) | Juvenile Justice and |
| | ) | Child Protection Department, |
| Petitioner-Appellee, | ) | Child Protection Division. |
| | ) | |
| v. | ) | Nos. 19 JA 1475-78 |
| | ) | |
| John P. | ) | The Honorable |
| | ) | Andrea Buford, |
| Respondent-Appellant). | ) | Judge Presiding. |

_____

JUSTICE GAMRATH delivered the judgment of the court.
Presiding Justice Tailor and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Trial court's parental unfitness and best interest findings were not against the manifest weight of the evidence.

¶ 2    Respondent John P. appeals from the trial court's order finding him an unfit parent under section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2022)), terminating his parental rights of minors Jo. P., Jos. P., Jose. P., and L.P., and placing the minors in the custody of the Guardianship Administrator of the Department of Children and Family Services (DCFS)

with the right to consent to their adoption. John argues the court's unfitness and best interest findings were against the manifest weight of the evidence. We affirm.

¶ 3                                        I. BACKGROUND

¶ 4        John and Kalyhia are parents of five children: K.P. born on March 22, 2015; Jo. P. and Jos. P. born on April 12, 2016; Jose. P. born on July 26, 2017; and L.P. born on June 3, 2019. At just two months old, on May 14, 2015, K.P. was placed in protective custody with DCFS after her pediatrician reported a lack of care and malnutrition. At the time, John was described as " 'extremely explosive' " and threatening towards the staff, and on October 22, 2018, his and Kalyhia's parental rights of K.P. were terminated. K.P. is not a child at issue in this appeal, but the other four minors are.

¶ 5        On December 11, 2019, the State filed petitions for adjudication of wardship and motions for temporary custody of the four minors, Jo. P., Jos. P., Jose. P., and L.P., alleging neglect due to an injurious environment and abuse due to physical abuse and substantial risk of physical injury. 705 ILCS 405/2-3(1)(b), (2)(i)-(ii) (West 2018). The petitions alleged on December 9, 2019, Jo. P. and his brothers were observed with "extensive bruising about their bodies," and Jo. P. had a fractured wrist and healing rib fractures. Medical personnel concluded the bruises were "non-accidental and rise to the level of abuse." During this time, the minors were in the sole care of their biological mother Kalyhia, as John was incarcerated on battery charges and cutting off his ankle monitor. Soon thereafter, the four children were placed with their current foster mothers, where they have resided ever since.

¶ 6        On March 4, 2021, the children were adjudicated abused and neglected based on the boys' "old and new injuries, including healing fractures," their "dirty and smelly" appearance, and the prior termination of John and Kalyhia's rights as to K.P. In April 2021, John was

released from prison and began supervised visits with the four children. At an August 6, 2021, dispositional hearing, Lutheran Social Services of Illinois (LSSI) caseworker Devonya Shelley testified that based on a May 2020 Integrated Assessment and May 2021 Family Service Plan, John was assessed to need parenting classes, individual therapy, and substance abuse, mental health, psychological, and domestic violence assessments. John had begun some of these services and engaged in supervised visits with the minors, but LSSI had not yet referred him to all services. At the hearing, the trial court adjudged the four children wards of the court, finding John unable for reasons other than financial circumstances alone to care for, protect, train, or discipline them. The court granted guardianship to the DCFS Guardianship Administrator with the right of placement, set a permanency goal of returning home within 12 months, and ordered LSSI to immediately refer John to all outstanding services.

¶ 7        On June 29, 2023, John was arrested for possession of a stolen vehicle, driving on suspended license, and operating an uninsured vehicle. On December 18, 2023, the trial court changed the permanency goal to substitute care pending determination of parental rights. The permanency order indicates John completed "some services and [was] visiting." However, the December 13, 2023, parenting capacity assessment (PCA) report prepared by the Cook County Juvenile Court Clinic (CCJCC) found the "likelihood of [John] being able to make the gains necessary to achieve return home is *** poor and it is unlikely that he will be able to address all the risk factors cited in the CCJCC report."

¶ 8        On May 10, 2024, the State filed supplemental petitions for the appointment of a guardian with the right to consent to adoption, alleging John was unfit for failing to make reasonable efforts and reasonable progress toward the return of the minors within any nine-month period following their adjudication of abuse and neglect. See 750 ILCS 50/1(D)(m)(i)-(ii)

(West 2022). In August 2024, the State filed an amended pleading specifying the following nine-month periods for failure to make "reasonable progress" under section (D)(m)(ii): September 18, 2021, to June 18, 2022; June 18, 2022, to March 18, 2023; and March 18, 2023, to December 18, 2023.

¶ 9        On September 5, 2024, John was convicted of possession of a stolen vehicle and later sentenced to four years' imprisonment. He is scheduled for release in September 2026.

¶ 10                                    A. Fitness Hearing

¶ 11        On November 7, 2024, the court held a termination hearing and admitted into evidence a February 2024 Family Service Plan, the PCA, and John's certified conviction for possession of a stolen vehicle. The court also heard from Zebulun Green, the LSSI caseworker who had been working with the family for the past two years. The evidence showed John was assessed to need individual therapy, anger management, a psychological evaluation, substance abuse assessment, domestic violence assessment, parenting classes, parenting coaching, and a court-ordered PCA. John completed individual therapy in June 2021, anger management in November 2022, a substance abuse assessment in 2022, and a psychological evaluation in June 2023. John did not have a case number to give the first referral for the domestic violence assessment and the "agency did not hear back from [the second] referral."

¶ 12        The PCA indicates John completed 19 hours of parenting classes as of August 24, 2021. According to Green, John participated in three sessions of parent coaching in May 2023, but the February 2024 Family Service Plan indicates John completed five out of six parent coaching sessions. John, however, "did not like [the coach's] critique." The agency requested a new coach, but he never heard back.

¶ 13 Green supervised all of John's visits with the children. In Green's opinion, John never progressed to a point where the agency could recommend unsupervised visits. Green described John as a loving, playful father, but "everything besides that lacked consistency." John was unable to care for the children or address their special needs. He was unable to safely divide his attention between all four children. Due to L.P.'s cognitive and mobility issues, John often focused his attention on her while the "boys were all around the room." John could not manage the boys' behavior, and Green had to "step in and engage the boys" during the majority of visits.

¶ 14 All four of the children have special needs and, thus, have required various services throughout the case. According to the PCA, Jo.P. has Attention-Deficit/Hyperactivity Disorder (ADHD), the twins are lactose intolerant, all four children have Individual Education Plans (IEPs), and L.P. is autistic, nonverbal, and cannot walk. Green testified that John did not attend any appointments for his children's services because they were "too early," or he lacked transportation to get there. However, "[t]hroughout the *** case," Green told John where the appointments were and provided him with a bus card so he could attend.

¶ 15 John's fiancé Diana P. testified she lived with John from 2021 until his incarceration in 2024. She participated in more than 10 or 20 visits with the children at their home, and she planned to coparent with John. John also said he planned to coparent with Diana and believed he could take care of his children. He testified he had completed every service he was asked to do and denied that the agency offered him transportation assistance. He said they only told him the location of L.P.'s therapy once.

¶ 16 The December 13, 2023 PCA outlines the "risk factors and parenting weaknesses that suggest [John] would be unable to adequately care for, parent, and protect" the minors. The trial court ordered the PCA based on John's June 2023 psychological evaluation, which noted

concerns regarding his ability to parent his children due to his own intellectual disability. The CCJCC clinician based her conclusions on case records, interviews with Green, John, and Diana, and observations of two child-parent visits in November 2023.

¶ 17　　The clinician described the child-parent visits as "chaotic," where John was "overwhelmed, dysregulated and frustrated with the children," and "unable to manage" them even with help from another adult. There were several times when the boys engaged in dangerous behaviors and would have gotten hurt if Green had not intervened. The clinician found that "[d]espite having completed parenting services, [John] seems to lack the ability to effectively organize, discipline, and communicate limits with his children." And although Diana and John said they will coparent, John will be the "primary caregiver" while Diana is at work.

¶ 18　　The clinician found John's greatest risk factor to be his parenting skills. But another significant risk factor was John's inability to "understand his children's special needs or how to help them, let alone advocate for them." For instance, John did not know Jo. P. was on medication for ADHD and did not understand what ADHD was or how to manage it. John did not realize the twins' lactose intolerance, as he provided dairy products as the only food during three visits in May and June 2022. Diana did not know what L.P.'s condition was and did not know which of the boys had ADHD. In the clinician's view, neither John nor Diana had "the necessary knowledge or training in effectively addressing the special needs of four very young children."

¶ 19　　Additional risk factors included John's lack of independent stable housing, his financial limitations, his inability to understand his own limitations, and the children's special needs – "especially as there are four of them and they present as very hyper and aggressive in their behavior." The CCJCC clinician recommended additional services of parent coaching,

attendance at all the children's appointments and meetings, and a domestic violence assessment. However, the clinician found it "unlikely" John will be able to address these risk factors even with additional services. The clinician opined, "the likelihood that [John] will be able to make the gains necessary to achieve a goal of Return Home is poor."

¶ 20    Based on the evidence, the trial court found John failed to make reasonable efforts and progress, and specifically stressed John's failure to make reasonable progress toward the return of the children within the relevant period. Although John completed "many of the services," he did not "successfully complete them," since he "still required additional assistance." The court noted that John brought dairy products to visits despite the twins' lactose intolerance. He could not manage all four children at the same time during the "chaotic" visits and unsupervised visits were never recommended. The court also commented on John's inability and unwillingness to attend to the special needs of L.P. coupled with his current incarceration. Given these factors and the CCJCC clinician's conclusion that it is "unlikely [John] will be able to mitigate the risk factors present even with assistance," the trial court found the State proved John unfit by clear and convincing evidence.

¶ 21                                B. Best Interest Hearing

¶ 22    After finding John unfit, the court proceeded to a best interest hearing. Green testified it would be in the best interests of the minors to terminate John's parental rights. Green explained that the minors were placed in two separate, non-relative foster homes since the case opened in December 2019. Jo. P. and Jos. P. live with Jessica M. and Jose. P. and L.P. with Nyree T. Green described the placements as safe and appropriate with no signs of abuse or neglect. Both foster mothers care for and advocate for the minors' special needs and want to adopt the children. The

minors have strong bonds and loving attachments to their foster mothers. The foster mothers provide biweekly sibling visits and understand the importance of maintaining those visits.

¶ 23     The trial court agreed with Green, finding it in the best interest of the minors to terminate John's parental rights. The court also appointed the DCFS Guardianship Administrator with the right to consent to adoption considering the loving bond between the foster mothers and the minors, the foster mothers' wishes to adopt the minors, and their ability to meet the minors' needs. John appeals, seeking reversal of the court's finding of unfitness and the best interest portion of the termination proceeding.

¶ 24                                 II. ANALYSIS

¶ 25                          A. Fitness Determination

¶ 26     John argues the trial court's finding of unfitness was against the manifest weight of the evidence where he made reasonable efforts and progress toward the return home of his children. He claims he was largely compliant with services and "any issues with such compliance were due to the agency's actions and inactions." We disagree.

¶ 27     Parental rights may be involuntarily terminated only where the court first determines by clear and convincing evidence that the parent is an "unfit person" under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). 705 ILCS 405/2-29(2) (West 2022). Under section 1(D)(m), a parent is "unfit" when they fail "(i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor" or "(ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(i)-(ii).

¶ 28    A finding of parental unfitness will not be disturbed unless it is against the manifest weight of the evidence, meaning, "the opposite conclusion is clearly evident" or "the determination is unreasonable, arbitrary, or not based on the evidence presented." *In re D.F.*, 201 Ill. 2d 476, 498 (2002). We may affirm the trial court "where the evidence supports a finding of unfitness as to any one of the alleged grounds." *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 11. Because we conclude that the trial court's finding that John failed to make "reasonable progress" was not against the manifest weight of the evidence, we only address that ground.

¶ 29    "Reasonable progress" requires objective "measurable or demonstrable movement toward the goal of reunification." *In re J.A.*, 316 Ill. App. 3d 553, 565 (2000). Reasonable progress exists when the court "can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). The "benchmark" for reasonable progress includes "the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001).

¶ 30    John insists he made reasonable efforts and progress and that any substantive barriers to progress were attributable to the referring agency, not to him. We disagree. Even if the agency delayed in making referrals, the manifest weight of the evidence shows John did not make reasonable progress to warrant his children being returned to his care in the near future. Rather,

the overwhelming weight of evidence shows, despite his completed services, John lacks the capacity to safely and effectively parent four children with special needs.

¶ 31    Lest we forget, visits were described as chaotic, lacking organization, communication, and discipline, and John never progressed to unsupervised visits. Although John planned to coparent with Diana, he would still be the primary caregiver while Diana is working, and his parenting skills were deemed a significant risk even with help from another adult. This is an even greater concern given the children's special needs, which both John and Diana lack the understanding and ability to care for. Additionally, the CCJCC clinician found that even with additional services, it is unlikely John could address the numerous risk factors so that return home could be achieved. This was due, in part, to his intellectual disability, his incarceration, and his track record with the eldest child K.P. in failing to engage in reunification services, which resulted in termination of John's parental rights in 2018. Based on the record, we cannot say the trial court's unfitness finding was against the manifest weight of the evidence.

¶ 32    The agency's delay in making referrals for John does not warrant reversal. When the trial court became aware of the delay, it ordered LSSI to immediately refer John to all outstanding services. John engaged in services and parent coaching sessions but still lacked the capacity to rise to the challenge of parenting four minors with special needs. "The point of requiring parents to attend classes and engage in services *** is so parents *apply* what they learn in their lives, in the real world, such that the court can be confident that the children will be safe in their care." (Emphasis in original.) *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 56. The evidence shows, despite classes and services, John did not comprehend the gravity of the children's issues and lacked the ability to apply the skills learned to tend to their special needs.

¶ 33        On this point, *Charlie V.*, 2025 IL App (5th) 241085-U, ¶ 27, cited by John is easily distinguishable, for in that case, DCFS never directed the father to correct problematic circumstances, and he otherwise completed services and did well in his parenting skills. Conversely, the clinician expressly found John's greatest risk factor to be his parenting skills. Unlike *Charlie V.*, John was well informed of the children's special needs but disregarded them during visits and failed to apply the parenting skills necessary to manage the four children. This resulted in chaotic visits and prompted Green to step in to engage and supervise the children because John could not manage all four.

¶ 34        John's reliance on *In re J.O.*, 2021 IL App (3d) 210248 is also misplaced. In *J.O.*, the court did not hold the mother's failure to progress in services against her where she was faced with homelessness and joblessness at the beginning of the COVID-19 pandemic. *Id.* ¶ 63. Here, the issue is not John's compliance or noncompliance with services, but rather, his failure to make reasonable progress despite engaging in services so his children could be safely returned to his care in the near future.

¶ 35        John argues the State failed to elicit testimony from Green as to "each of the proposed nine-month periods." However, the State can prove a parent's failure to make reasonable progress during "any" nine-month period following adjudication of neglect or abuse alleged in the State's pleading. 750 ILCS 50/1(D)(m)(ii). Green's testimony and the PCA sufficiently tie John's failure to make reasonable progress to the latter two nine-month periods pled by the State: June 18, 2022 to March 18, 2023, and March 18, 2023 to December 18, 2023.

¶ 36        The PCA indicates Green was assigned to the case in April 2022. Green testified based on personal knowledge and observations during the relevant periods, and the PCA was based on 2023 visits and interviews with John, Diana, and Green during these timeframes.

¶ 37    John further asserts the trial court erred in considering his incarceration because "[i]ncarceration alone is not a sufficient basis for unfitness pursuant to ground (m)." Even assuming incarceration alone is not sufficient, it certainly "can impede progress toward the goal of reunification," as it has done here. See *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 21. Since the children's births, John has been incarcerated twice and is not scheduled to be released for another 17 months. This fact, alongside the other ample evidence supporting John's failure to make reasonable progress, amply supports the court's finding of unfitness by clear and convincing evidence.

¶ 38                                    B. Best Interest Determination

¶ 39    After a finding of parental unfitness, the State must prove by a preponderance of the evidence that termination of parental rights is in the best interest of the children. *In re D.T.*, 212 Ill. 2d 347, 366 (2004). We will not disturb a best interest determination unless it is against the manifest weight of the evidence. *In re Jaron Z.*, 348 Ill. App. 3d 239, 261-62 (2004).

¶ 40    In making a best interest determination, the court "shall" consider: the children's physical safety and welfare; the development of their identity; their familial, cultural, and religious background and ties; their sense of attachments, including where the children feel loved, attached, and valued, and sense of security, familiarity, and continuity of affection; the children's wishes and long-term goals; their community ties; their need for permanence; and the uniqueness of every family and child. 705 ILCS 405/1-3(4.05) (West 2022). The court may also consider "the nature and length of the child[ren]'s relationship with [their] present caretaker and the effect that a change in placement would have upon [their] emotional and psychological wellbeing." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 41    We have no reason to doubt the love and affection between John and his children. However, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. From all accounts, the four children are in safe, stable, loving homes where they have lived since 2019. They have strong bonds with their foster mothers, both of whom wish to adopt the children and have shown a demonstrated ability to care for their needs. Displacing the children from the only steady homes they have known for the last five-and-a-half years and placing them John who has been incarcerated most of their lives, would be contrary to the children's best interest and against the manifest weight of the evidence. As such, we affirm the trial court's decision to terminate John's parental rights and allow the adoptions to proceed.

¶ 42                                CONCLUSION

¶ 43    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 44    Affirmed.