NOTICE
Decision filed 02/26/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 241085-U

NOS. 5-24-1085, 5-24-1086 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* CHARLIE V. and CALVIN V., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Bond County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 23-JA-9, 23-JA-10 |
| | ) | |
| Charles V., | ) | Honorable |
| | ) | Martin J. Mengarelli, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE BOIE delivered the judgment of the court.
Justices Cates and Sholar concurred in the judgment.

**ORDER**

¶ 1     *Held*:    We reverse the judgment of the circuit court terminating the respondent's parental rights where the circuit court's finding that that the respondent was an unfit person was contrary to the manifest weight of the evidence.

¶ 2     The respondent, Charles V., appeals the September 6, 2024, order of the circuit court of Bond County terminating his parental rights with regard to Charlie V. and Calvin V. (minor children). On appeal, the respondent challenges the circuit court's judgment arguing that the State failed to present sufficient evidence for the circuit court's finding that he was an unfit person. For the following reasons, we reverse the judgment of the circuit court. [1]

---

[1]The cases in the circuit court also involved the minor children's mother, Joyce V., who separately appealed the circuit court's judgment, which was docketed as Nos. 5-24-1087 and 5-24-1088. As such, we will only include information regarding Joyce V. that is relevant to the arguments raised in this appeal.

1

¶ 3                                    I. BACKGROUND

¶ 4     The respondent and mother were married and residing together when, in October 2022,[2] the Department of Children and Family Services (DCFS) initiated an intact case due to the severe neglect of the minor children.[3] During the course of the intact case, it was disclosed that mother was having a relationship with an individual named John M., who had previously been convicted for domestic assault against his ex-wife and sexual assault against a minor.[4] It was also disclosed that mother had allowed the minor children to be around John and it was reported that John "likes to get drunk, handsy" and had made comments such as "I can't wait to get my hands on you, I'm going to bust your a**" to mother's children.[5]

¶ 5     DCFS deemed the intact case a failure, and on March 2, 2023, the State filed a petition for adjudication of wardship. The petition alleged that the minor children were neglected because they were in an environment injurious to their welfare based on (1) the mother's inability or unwillingness to protect the minor children (705 ILCS 405/2-3(1)(b) (West 2022)) and (2) not receiving the proper or necessary medical care where the mother failed to follow through on medical treatment for the minor children's sibling (*id.* § 2-3(1)(a)). The petition also alleged that the minor children were abused where they were at a substantial risk of emotional impairment based on mother being unable or unwilling to make viable parenting decisions (*id.* § 2-3(2)(ii)).

---

[2]The record is unclear on the exact date that the DCFS's intact case was initiated.

[3]The initial report indicated that, among other allegations, the minor children were "covered in bites," and did not receive regular diaper changes to the point that their "butts were so raw, bleeding, and raised up" that they had to be taken to an emergency room.

[4]John M. was later arrested on March 1, 2024, at the mother's father's home for two counts of predatory child sexual abuse (not involving the minor children) and possession of methamphetamine. His parole was revoked, and he is currently incarcerated.

[5]Mother has a total of five children. None of mother's other children are involved in this appeal.

The petition did not contain any allegations that the respondent was directly responsible for the abuse or neglect, although he resided in the same household where the minor children were abused and neglected. Protective custody of the minor children was taken on April 10, 2023.

¶ 6    The circuit court entered a shelter care order on April 10, 2023, finding that the minor children were abused and neglected and that it was a matter of urgent and immediate necessity for the safety and protection of the minor children that they be placed in shelter care. The circuit court entered a written order on June 30, 2023, adjudicating the minor children as neglected based upon the parties' stipulation that the minor children were in an environment that was injurious to their welfare (*id.* § 2-3(1)(b)).[6] The circuit court found that the neglect was inflicted by a parent, specifically, the mother. On August 18, 2023, the circuit court entered a dispositional order finding that the respondent was unfit and unable, and that mother was unfit and unwilling, for reasons other than financial circumstances alone, to care for, protect, train, educate, supervise, or discipline the minor children "based upon mental health concerns, etc.," and that it was consistent with the health, welfare, safety, and in the best interest of the minor children, to be made wards of the court. As such, the minor children were made wards of the court, and custody and guardianship of the minor children was placed with the guardianship administrator of DCFS.

¶ 7    DCFS filed a family service plan on May 31, 2023. The service plan required the respondent to participate in the following services: (1) complete a mental health assessment and follow through with all recommendations; (2) establish a solid working relationship with his psychotherapist to include regular attendance and positive reports from the therapist in order to address any mental health needs; (3) keep all appointments with DCFS and sign all necessary

---

[6]The record on appeal does not contain a transcript regarding the adjudication hearing. The only transcript contained in the report of proceedings is of the circuit court's fitness and best interest hearing conducted on September 6, 2024.

3

release of information; (4) not discontinue any service without the consent of DCFS; (5) complete a substance use assessment and follow through with any recommendations; (6) submit to random drug and alcohol testing; (7) participate in parenting instructions; (8) engage in visitation and display minimal parenting skills during visits; (9) provide safe, stable, and clean housing; (10) maintain employment; and (11) inform DCFS of all changes in address, telephone number, employment, and household members. Marriage counseling was later added to the respondent's services on October 20, 2023.

¶ 8 In a report to the circuit court filed on March 13, 2024, DCFS indicated that the respondent had been compliant with random drug testing and had been negative for all substances. As such, substance use was removed from his service list. The report also indicated that the respondent had completed a mental health assessment and was not recommended for services; that he engaged in visitation and was reported to do well with the minor children; had completed a parenting class on November 1, 2023; had completed his parenting capacity assessment; had adequate housing and employment; and, had attended marriage counseling. The report stated that a psychological evaluation had been added to the respondent's services and was awaiting scheduling. The report went on to state that mother continued her relationship with John and that the respondent was aware of the continued relationship, but had "not taken any initiative to establish stable housing without [mother]."

¶ 9 The family service plan filed by DCFS on April 9, 2024, stated that the respondent had achieved or had satisfactory progress on all of his services except notification of any change in household membership and stable home environment. The report stated that the respondent and mother were "back and forth in their relationship" and that mother sometimes resided in the home, but that the respondent had not reported any household membership changes to his caseworker.

4

¶ 10    On April 10, 2024, the State filed a motion for termination of parental rights. The motion alleged that the respondent was an unfit person for failing to make reasonable efforts (750 ILCS 50/1(D)(m)(i) (West 2022)), and/or reasonable progress (*id.* § 1(D)(m)(ii)), towards the return of the minor children within the first nine months after the adjudication of neglect, specifically, from June 30, 2023, until March 30, 2024. The circuit court held a hearing on the State's motion for termination on September 6, 2024.

¶ 11    At the hearing, the State called Erin Schaub to testify. Schaub stated that she was employed with DCFS as a placement supervisor and had overseen the case since the minor children came into protective custody in April 2023. After responding to questions regarding mother, Schaub testified that the respondent was aware of the relationship between mother and John, and that it was that relationship that had caused the minor children to be taken into protective custody. Schaub testified that the respondent was never considered a viable placement option for the minor children since the respondent, at no point, indicated that he would put the minor children's safety above his relationship with mother. Schaub stated that the respondent would allow mother to move in-and-out of his home and that he never set firm boundaries with mother regarding her relationship with John.

¶ 12    Schaub went on to state that the respondent had, during the relevant nine-month period, filed for divorce twice, but did not follow through with terminating the marriage. According to Schaub, if the respondent had taken decisive action concerning the safety concern that mother's relationship had posed, "he very well could have been a placement option for his children but he never did that." Instead, Schaub stated that the respondent allowed his relationship with mother to continue despite the fact that mother had an ongoing relationship with John.

¶ 13    Schaub further testified that the concerns related to the medical neglect allegations and the environmental neglect allegations had been resolved during the intact case and that it was mother's relationship with John that had caused the minor children to come into care. Schaub stated that there was never an incident where the respondent had left the minor children around John, nor could Schaub confirm or deny that the respondent knew beforehand that mother was going to take the minor children around John. Schaub also testified that she was aware that the respondent and mother were engaging in marriage counseling and that it was possible that mother had informed the respondent that mother's relationship with John had ended.

¶ 14    Schaub testified that the respondent had completed everything he was required to do in this parenting plan and there were no major concerns with the respondent's visits with the minor children. Schaub stated that although the respondent had engaged in all recommended services, those services were not resulting in any real-life changes since he continued an on-again, off-again relationship with mother. As such, the respondent's minimum parenting standards were called into question because he failed to enforce boundaries with mother. Schaub testified that it was her opinion that the respondent should be found unfit because "[h]e failed to—while he was not the source of the safety concerns, he failed to protect his children from the safety concerns that were very real and present."

¶ 15    Mother was called to testify and stated that she and the respondent had divorced in June 2024. Mother further testified that she had moved out of the respondent's home in May 2024, currently resides with her father, and no longer has a relationship with John, although she did recently visit John in jail.

¶ 16    Next, the respondent was called to testify. The respondent stated that he was married to mother from December 14, 2019, until June 17, 2024. The respondent stated that he wanted the

marriage to work, that mother had maintained to him that her relationship with John had ended, and that mother had stated that she wanted to work things out with the respondent. The respondent testified that he had filed for divorce twice, but withdrew the divorce paperwork in hopes of keeping the family together. The respondent stated that mother continued contact with John, after being told not to, which left him "no other choice but to get divorced."

¶ 17    Upon completion of the testimony, and after hearing arguments, the circuit court found as follows:

> "Okay. First off, the Court has had an opportunity to—or the Court is familiar with this case. Because these parties have been in front of the judge before and at shelter care and also at adjudication, the parents are always admonished that they need to make reasonable efforts and reasonable progress as to each service on their service plan. And it is explained to the parents that reasonable efforts mean that if they want you to take a class or do some sort of counseling, that you actually show up and do it. And it is also explained that reasonable progress means that if you go to these classes or counseling sessions, that you actually participate and learn something and apply it to your life. You don't just show up to go through the motions and check off the boxes.
>
>     ***
>
> And in regards to the respondent father, the Court finds that the State has proved by clear and convincing evidence that [the respondent] is an unfit person to have these children for the following reason: He has failed to make reasonable progress towards the return of the children to the parent during a nine month period specifically June 30th, 2023 through March 30th, 2024."

¶ 18    The circuit court then proceeded to a best interest hearing and found that it was in the minor children's best interests that the parental rights of the respondent be terminated. As such, the circuit court ordered the termination of the respondent's parental rights with regard to the minor children and the respondent timely appealed.

¶ 19                                    II. ANALYSIS

¶ 20    Termination of parental rights proceedings are governed by the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act, which delineates a two-step process to terminate parental rights involuntarily. 705 ILCS 405/2-29(2) (West 2022).

¶ 21    The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). 705 ILCS 405/2-29(2), (4) (West 2022); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). The circuit court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). Thus, a finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000).

¶ 22    If the circuit court finds a parent to be unfit, the cause proceeds for the circuit court to determine whether it is in the best interests of the child for the parent's rights to be terminated. 705 ILCS 405/2-29(2) (West 2022); *In re M.J.*, 314 Ill. App. 3d at 655. At this stage of the proceedings,

8

the focus of the circuit court shifts to the best interests of the child and away from the rights of the parent. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 30. "[T]he parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364.

¶ 23    In this matter, the respondent does not challenge the circuit court's best interest finding. Instead, the respondent challenges the circuit court's finding of unfitness arguing that the circuit court improperly imputed the actions of mother upon the respondent without any evidence that the respondent had actual knowledge of mother's actions. As such, the respondent argues that the circuit court's finding that he was an unfit person on the grounds that he failed to make reasonable progress during the nine-month period of June 30, 2023, through March 30, 2024, is not supported by the record and is against the manifest weight of the evidence.

¶ 24    "Reasonable progress" is an objective standard, based upon the amount of progress as measured from the conditions existing at the time of removal. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. "Reasonable progress" requires a measurable or demonstrable movement toward the goal of reunification. *Id.* A parent has made "reasonable progress" when the trial court can conclude that it will be able to return the child to parental custody in the near future. *Id.* The benchmark for measuring a parent's reasonable progress encompasses the parent's compliance with the service plans and the circuit court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17. If a service plan has been established to correct the conditions that were the basis for the removal of the child from the parent, a "failure to make reasonable progress" includes a parent's failure to substantially fulfill his obligations under the service plan. 750 ILCS 50/1(D)(m) (West 2022). At

all times, the overall focus in evaluating a parent's progress towards the return of the child should remain on the fitness of the parent in relation to the needs of the child. *In re C.N.*, 196 Ill. 2d at 216.

¶ 25    Here, there was no evidence, nor even any allegations, that the respondent had exposed the minor children to John. Schaub testified that it was her opinion that the respondent was unfit because "while he was not the source of the safety concerns, he failed to protect his children from the safety concerns that were very real and present." The allegation that the respondent failed to protect the minor children is based on the respondent's participation in his required marriage counseling and his efforts to salvage his marriage to mother by engaging in an on-again, off-again relationship with mother during a time when the minor children were in the custody of DCFS and mother could not have exposed the minor children to John. Although the respondent continued his relationship with mother knowing that she was continuing her relationship with John, the respondent's service plan never required the respondent to prohibit mother from residing in the home or limiting contact with mother.

¶ 26    According to Schaub, if the respondent had taken "decisive action" regarding the safety concern that mother's relationship had posed, "he very well could have been a placement option for his children but he never did that." DCFS, however, never specifically set forth in the respondent's service plan what "decisive action" was required of the respondent in order to be a placement option, such as a requirement that mother resides outside of the home and have no unauthorized contact with the minor children. Under such a requirement, there would be a valid concern regarding the mother moving in-and-out of the marital residence. Instead, DCFS required the respondent to engage in marital counseling and then held his attempts at reconciliation as a

10

failure to provide a stable home and/or to correct the conditions which caused the minor children to come into care.

¶ 27    The record indicates that the respondent had completed all services, except the psychological evaluation which had not yet been scheduled, had a safe home, employment, and did well in his parenting skills during his visits with the minor children. Schaub testified that the only concern with the respondent's parenting skills was that "he needed to learn to set boundaries with [mother]"; yet again, there is no indication within the respondent's service plan on what those boundaries should have consisted of so that respondent would have had knowledge of a specific task.

¶ 28    Where DCFS fails to keep an individual apprised of his or her services, the failure to complete that service or services cannot support a finding of unfitness. *In re K.G.*, 2023 IL App (5th) 230148-U, ¶ 32; *In re T.D.*, 268 Ill. App. 3d 239, 247 (1994). The respondent was never provided a clear requirement regarding his actions concerning mother, other than to engage in marital counseling. As such, the respondent's failure to take an unknown "decisive action" or set boundaries of an unknow nature, cannot be the basis for finding of unfitness for failure to make reasonable progress.

¶ 29    Although we give great deference to the circuit court, we find that the evidence presented in this matter does not support a finding of unfitness based on the respondent's failure to make reasonable progress. The evidence indicated that the respondent had fully engaged in his services, completed or made progress on each of his services, and that the minor children could be returned to the respondent's care in the near future under specific requirements with regard to mother's contact with the minor children.

¶ 30    Therefore, we find that the circuit court's finding that the respondent was an unfit person for failing to make reasonable progress was against the manifest weight of the evidence. Accordingly, we reverse the judgment of the circuit court terminating the respondent's parental rights with regard to the minor children. Upon return of this matter to the circuit court, we anticipate that DCFS will reengage with the respondent, follow through on scheduling the respondent's remaining service, and provide any other necessary services to assist the respondent in his continuing progress.

¶ 31                                    III. CONCLUSION

¶ 32    Based on the above, we find that the circuit court's finding that the respondent was an unfit person for failing to make reasonable progress was against the manifest weight of the evidence. Therefore, we reverse the September 6, 2024, judgment of the circuit court of Bond County terminating the respondent's parental rights with regard to the minor children.

¶ 33    Reversed.