NOTICE
Decision filed 09/24/25.
The text of this decision
may be changed or
corrected prior to the
filing of a Petition for
Rehearing or the
disposition of the same.

2025 IL App (5th) 250398-U

NOS. 5-25-0398, 5-25-0399, 5-25-0400, 5-25-0401, 5-25-0402 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed
under Supreme Court
Rule 23 and is not
precedent except in the
limited circumstances
allowed under Rule
23(e)(1).

| | | |
|---|---|---|
| *In re* KAIDEN G., HAYLEE G., LYDIA G., HENRY G., and OLIVER G., Minors | ) ) ) | Appeal from the Circuit Court of Marion County. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | Nos. 22-JA-22, 22-JA-23, 22-JA-24, 22-JA-25, 22-JA-51 |
| Shawn G., | ) ) | Honorable Ericka A. Sanders, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE CATES delivered the judgment of the court.
Presiding Justice McHaney and Justice Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court's findings that the respondent father was an unfit parent and that termination of his parental rights was in the best interests of the children were not against the manifest weight of the evidence.

¶ 2    The respondent, Shawn G. (Father), appeals the circuit court's order terminating his parental rights to his five children.[1] He argues that both the circuit court's finding of unfitness and its finding that termination of his rights was in the children's best interest were against the manifest weight of the evidence. We affirm the judgment of the circuit court.

---

[1]Father filed separate appeals in the cases involving each of his five children. This court ordered the appeals consolidated under the case number assigned to Kaiden's case (No. 5-25-0398).

1

¶ 3                                    I. BACKGROUND

¶ 4     On April 12, 2022, the State filed petitions for adjudication of wardship and motions for temporary custody as to Father's four oldest children, Haylee (born May 27, 2015), Kaiden (born June 7, 2016), Henry (born November 28, 2018), and Lydia (born October 5, 2020). The petitions named both Father and his wife, Anna G. (Mother), as respondents.[2] The State alleged that the children were neglected due to an environment injurious to their welfare because (1) Kaiden alleged that Father "bites [his] pee pee"; (2) Haylee alleged that Father "humps" her; (3) Mother and Father failed to obtain medical treatment for Haylee, who suffered frequent urinary tract infections, allegedly caused by placing toys in her genitals; and (4) Father and Mother failed to arrange academic assistance for Kaiden despite being contacted by his school with concerns. The circuit court held a shelter care hearing that day, after which it entered orders for temporary custody, finding that the parents "refused to cooperate with a safety plan and/or intact services."

¶ 5     The youngest child, Oliver, was born on October 1, 2022. Two days later, the State filed a petition for adjudication of wardship and a motion for temporary custody. The petition alleged that Oliver was neglected due to an environment injurious to his welfare because his four siblings were wards of the court and the conditions leading to their removal had not been corrected. After a shelter care hearing that same day, the circuit court entered an order for temporary custody, finding that Father and Mother had not complied with the Department of Children and Family Services (DCFS) service plans relating to their four older children.

¶ 6     On October 11, 2022, the State filed amended petitions for adjudication of wardship. The State alleged that the children were neglected due to an injurious environment because (1) both Kaiden and Haylee alleged they did not feel safe at home, (2) Kaiden alleged that Father hurt him

---

[2]Mother appealed the circuit court's ruling separately and is not a party to this appeal.

and sexually abused him and his siblings, and (3) Haylee alleged that Father "humped" her and stuck his finger in her butt.

¶ 7 The adjudicatory hearing took place over two days on December 13, 2022, and March 7, 2023. At the end of the hearing, the circuit court found the children to be neglected. On April 3, 2023, the circuit court entered written adjudicatory orders finding the children to be neglected due to an environment injurious to their welfare (705 ILCS 405/2-3(1)(b) (West 2022)). The dispositional hearing occurred on April 17, 2023. At the end of the hearing, the circuit court found that it was in the children's best interests to remain in the care and custody of DCFS. The court noted that both parents refused to attend counseling sessions or communicate with their caseworker. The circuit court entered dispositional orders making the children wards of the court on April 25, 2023.

¶ 8 In September 2023, the family's caseworker arranged for supervised visitation with the children after the parents began engaging with services. On November 27, 2023, the circuit court ordered that Mother and Father were to have no further contact with the three oldest children, Haylee, Kaiden, and Henry. In a docket entry, the court stated that these children had "extreme trauma responses" to a visit with their parents and that during the visit, Father threatened to "whoop" one of the children. The court further noted that the agency arranged the visits without first consulting with the children's counselors.

¶ 9 In a May 22, 2024, docket entry, the circuit court suspended Father and Mother's visits with the two youngest children, Lydia and Oliver. The court explained that its ruling was due to the children's "clear traumatic responses" following visits.

¶ 10 On December 16, 2024, the State filed petitions to terminate both parents' parental rights to all five children. The petitions alleged that both Father and Mother were unfit on two statutory

3

grounds: (1) failure to make reasonable efforts to correct the conditions that led to the children's removal during any nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(i) (West 2024)), and (2) failure to make reasonable progress toward the return of the children during any nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(ii) (West 2024)). The State identified three nine-month periods for both failure to make reasonable efforts and failure to make reasonable progress: (1) March 8, 2023, to December 8, 2023; (2) December 9, 2023, to September 9, 2023; and (3) March 15, 2024, to December 15, 2024.

¶ 11 The matter came for hearing on the petition to terminate on February 12, 2025. At the outset, the assistant state's attorney informed the circuit court that the State intended to present evidence concerning only the latter two of the nine-month periods identified in the petition to terminate.

¶ 12 The State's primary witness was Dollie Vogler, an employee of Caritas Family Solutions, a contract agency with DCFS. Vogler served as the family's caseworker from December 2023 to November 2024. Vogler testified that the first steps she took upon receiving the case were to conduct an integrated assessment of both parents and refer them for parenting capacity assessments and psychological evaluations. She indicated Father did not complete his psychological evaluation.

¶ 13 Vogler identified two service plans she had developed for the family dated July 22, 2024, and October 1, 2024, which were admitted into evidence as Exhibits 3 and 4, respectively. She explained that ordinarily, she developed a new service plan every six months. In this case, however, she created an updated plan in July 2024 to include services recommended in psychosexual evaluations performed in May 2024. Vogler testified that she created a service plan for the family in April 2024 as well; however, that plan was not entered into evidence. When asked about the ratings of the parents' progress contained in the service plans, Vogler explained that the

4

ratings are based upon evaluations of their progress over the six months preceding each new service plan.

¶ 14 Vogler explained that her usual practice was to meet with parents to review their new service plans. After this review occurs, she normally asks the parents to sign the plan. Vogler acknowledged that this did not occur for the July 2024 and October 2024 service plans. She explained that at the time she developed these two plans, she did not have in-person contact with Father and Mother as visits with the children had ended in May 2024, and it was at these visits that she was able to meet with them in person. The only time Vogler met with Father or Mother to discuss a service plan was when she was first assigned their case, and that would have been in regard to a prior service plan.

¶ 15 Vogler testified at length concerning the limits to her in-person contact with Father and Mother and the reasons for those limits. She stated that Father verbally threatened her and other social service workers via text messages. Vogler explained that, because of these threats, she and other agency employees only met with Father and Mother during their supervised visits with the children. Vogler was able to review their service plans with them at these meetings; however, she had no in-person contact with them after visits with the youngest children stopped in May 2024. Instead, Vogler attempted to communicate with Father and Mother through email and text messages, but they usually did not respond. Vogler acknowledged that in July 2024, she changed her phone number and did not initially provide the new number to Father and Mother after she received "very mean" messages from Father. She was not asked to elaborate. Vogler testified that her supervisor decided that all communications would be by email and that Father and Mother's attorneys would be included in the chain. Vogler eventually provided Father and Mother with her new phone number.

¶ 16    Vogler testified that she sent copies of the July 2024 service plan to Father and Mother and their respective attorneys by email. She testified that she reviewed the recommendations in the service plan with Mother over the phone; however, she did not indicate that she had any similar discussions with Father. Although Vogler could not recall whether she sent copies of the October 2024 service plan by email, she knew Mother and Father received a copy because they sent her a photograph of it. She explained that she mailed a copy of the service plan and, although it went to the wrong address, Mother and Father received it because it was delivered to "the brother's house."

¶ 17    Vogler testified that the goals for Father in both service plans included a mental health assessment, a substance abuse assessment, a psychological assessment, parenting classes, and treatment with a licensed sex offender treatment provider. The overall rating for Father's progress on these goals was unsatisfactory. Vogler emphasized that both parents refused to acknowledge or take responsibility for "the reason the children came into care."

¶ 18    On cross-examination, Father's attorney questioned Vogler about a psychological assessment scheduled for April 29, 2024, that Father did not attend. When asked why he did not attend the assessment, Vogler explained that she offered to drive Father to the appointment, but when he later threatened an investigator who attempted to visit the family's home, her supervisor instructed her not to go to the family's home. Vogler informed Father on April 12, 2024, that she would not be able to drive him to the April 29 appointment. She testified that in response, he told her he would not be able to get there on his own, and at this point, she offered to provide him with a $40 gas card. On April 27, Vogler informed Father that she could provide him with an Uber to take him to the assessment, but he told her to "keep it" because his attorney had arranged a different psychological assessment for him.

6

¶ 19   Vogler's supervisor, Krystal Foley, also testified for the State. When Vogler left her position in November 2024, Foley briefly acted as the family's caseworker from November 15, 2024, to January 6, 2025. When asked if Father made any progress during this period, Foley replied, "Not to my knowledge, no." On cross-examination, she acknowledged that she did not speak with any service providers during her brief tenure as caseworker.

¶ 20   The circuit court also considered Exhibits 3 and 4, the service plans. Each plan contained the same nine goals for Father, along with evaluations rating his progress on those goals prior to the date of the plan. We note that most of the ratings included in the July 2024 service plan were based on evaluations conducted in April 2024 and reflect Father's progress between October 2023 and March 2024. The ratings in the October 2024 service plan all reflect his progress between April and September 2024.

¶ 21   The first four goals were originally established in May 2022, shortly after the children were removed from the home. Father's first goal was to complete an integrated assessment and follow all recommendations. Father completed the assessment with Vogler on January 8, 2024. Vogler rated his progress on this goal as satisfactory in April 2024. In the October 2024 evaluation, however, she rated his progress as unsatisfactory because he did not follow through on the recommendations consistently.

¶ 22   Father's second goal was to complete a parenting capacity assessment and follow all recommendations. Father completed the assessment itself on February 22, 2024. Vogler rated his progress on this goal as satisfactory in an April 2024 evaluation; however, she rated his progress as unsatisfactory in her October 2024 evaluation.

¶ 23   The third goal was to complete a psychological assessment and follow the assessor's recommendations. As discussed previously, Father missed a scheduled appointment for this

assessment on April 29, 2024. Vogler rated Father's progress toward this goal as unsatisfactory in both the April and October evaluations. In the October evaluation, she noted that as of that time, Father still had not completed the assessment.

¶ 24 The fourth goal for Father was to complete a psychosexual assessment and follow the assessor's recommendations. Father participated in the assessment on February 1, 2022; however, he did not engage in treatment with a licensed sex offender treatment provider, as recommended. Vogler therefore rated Father's progress toward this goal as unsatisfactory in both the April 2024 evaluation and the October 2024 evaluation.

¶ 25 Father's fifth goal, added in May 2024, was to engage in counseling with a licensed sex offender treatment provider. Vogler rated Father's progress toward this goal as unsatisfactory in a July 23, 2024, evaluation, noting that as of that date, she had been unable to reach Father to discuss this recommendation with him. In an October 2, 2024, evaluation, she again rated Father's progress as unsatisfactory for the same reason.

¶ 26 The sixth goal for Father (established in May 2022) was to complete a mental health assessment. Father completed the assessment on March 7, 2024. Vogler rated his progress as satisfactory in the April 2024 evaluation, but she rated his progress as unsatisfactory in the October 2024 evaluation, noting that he did not consistently follow through with recommended services.

¶ 27 Father's seventh goal was to participate in a substance abuse assessment and follow all recommendations. Vogler rated his progress as satisfactory on both service plans, noting that he completed the assessment prior to April 1, 2024, and the assessor did not recommend additional services.

¶ 28 The eighth goal for Father was to take parenting classes. This goal was added in October 2023 due to concerns that arose during one of his supervised visits with the children when he

threatened to "whoop" one of his children if the child continued to act out. Vogler rated Father's progress as unsatisfactory in her April 2024 evaluation. However, Father began taking parenting classes in August 2024 and was rated as satisfactory in Vogler's October 2024 evaluation.

¶ 29     Father's final goal, established for him in April 2024, was to provide proof of stable income and housing. Vogler rated his progress on this goal as unsatisfactory in both evaluations, noting in each that Father must provide proof of his income and allow an investigator to visit the family's home for a safety check.

¶ 30     In ruling from the bench, the circuit court first addressed the question of whether Father made reasonable efforts. The court found that Father completed parenting classes and engaged in the parenting capacity assessment, but he refused to attend the psychological evaluation, did not communicate consistently with the caseworker, and was "verbally abusive and threatening" when he did communicate. The circuit court further found as follows: "[Father] has taken no responsibility for the reasons why the children were brought into care and has shown absolutely no behavior change." In conclusion, the court found that the State had met its burden of finding Father unfit. The court made similar findings with respect to Mother.

¶ 31     The circuit court held a best interest hearing on April 2, 2025. Azamatdzhan Spindler, Kaiden's foster father, testified that he and his wife loved Kaiden and wanted to adopt him. Spindler noted that Kaiden was related to his wife, although he did not specify how they were related. Henry's foster father, Harold Akers, a widower with grown children, likewise testified that he loved Henry and wanted to adopt him.

¶ 32     The children's maternal grandmother, Donna Head, is Haylee's foster mother. Head testified that she loved Haylee and wanted to adopt her. On cross-examination, she was asked about Haylee's relationship with her disabled adult son, Joe, who suffered from multiple sclerosis.

9

She testified that while she was at work, Haylee attended daycare. Asked if this was because of Joe's medical condition, Head replied in the negative and explained that she wanted Haylee to be around other children.

¶ 33    Lydia's foster mother, Alicia Hodgins, is Mother's first cousin. She testified that she loves Lydia and wants to adopt her. Hodgins acknowledged on cross-examination that she was initially hesitant to commit to adopting Lydia. She explained that Lydia had some behavior that was concerning, and she wanted to be certain that, as a single mother, she would be able to handle Lydia's needs. She testified that she now felt confident that Lydia would benefit from counseling and possibly medication. Hodgins has a 10-year-old daughter who lives with her half the time. She said that adding Lydia to the family was "an adjustment" for her daughter, but the children are "like normal siblings" in that they quarrel at times, but they love each other.

¶ 34    Oliver's foster father, Mark Collins Jr., testified that Oliver had lived with him and his wife since he was only three days old. They also have a one-year-old daughter, Johanna. Collins testified that he, his wife, and their daughter all love Oliver. Collins confirmed that he wanted to adopt Oliver.

¶ 35    All five foster parents also testified concerning where the children attended school and church. With the exception of Akers and Henry, the families all attended the same church, and some of the children attended the same school.

¶ 36    Foster care supervisor Krystal Foley was the State's final witness. She testified that she visited all five foster homes and had no concerns about any of the foster families adopting the children. The children's court-appointed guardian *ad litem* questioned Foley about the decision to place the five children in separate homes. Foley acknowledged that DCFS policy is to place siblings together when possible. In this case, however, she believed that separate placements were

in the children's best interests. She explained, "With some of the behaviors that they have, they could very well be triggering each other if they're placed together. There's concerns of them perpetrating sexual abuse on one another if placed together, so this is the best way to keep everybody safe." Foley testified that the decision to separate the children was based on consultation with people in "DCFS Clinical." Foley further testified that the children attended sibling visitation sessions and continued to have a bond with each other.

¶ 37 Mother testified that she had been married to Father for 11 years and they had lived in the same house for 10 years. She further testified that they ran their own business together selling tractor parts and "stuff like that." Mother believed the children should be placed together because they loved each other and missed each other. Finally, she testified that when the older children were in the care of her mother, Donna Head, various problems arose.[3] According to Mother, both Haylee and Kaiden asked to return home and the children smelled bad during visits. She asserted that despite Head's claim to the contrary, she often left the children in the care of Joe or their grandfather for short periods of time. (Head was widowed at the time of the best interests hearing.)

¶ 38 Father did not testify at the hearing. The circuit court took matters under advisement.

¶ 39 On April 23, 2025, the circuit court entered a written order terminating Mother and Father's parental rights. The court first found as follows: "As the Court found in the fitness phase of this proceeding, [Mother and Father] do not acknowledge that their children were abused or neglected. They do not acknowledge that their children experience symptoms and behaviors related to trauma." In addition, the court found that all of the children's foster families provide for their physical and emotional needs and that all of the children feel safe in their foster homes. The court

_____

[3]We note that, although not directly pertinent to this appeal, Mother expressed a great deal of hostility to Head. She believed that Head was responsible for fabricating allegations of sexual abuse in an effort to obtain custody of the children, and when asked to describe three wishes during the psychosexual assessment, one of Mother's wishes was to stay as far away from Head as possible.

further found that the foster parents all ensured that the children attended sibling visits and maintained their bond, something that would continue as long as it was in the best interests of the children. The circuit court concluded that termination of parental rights was in the children's best interests. Father subsequently filed this timely appeal.

¶ 40                                    II. ANALYSIS

¶ 41    Father argues that the circuit court's findings were against the manifest weight of the evidence with respect to both his unfitness and the children's best interests. We disagree.

¶ 42                              A. Standard of Review

¶ 43    Termination of parental rights involves a two-step process. First, the State must prove that the respondent parent is unfit by clear and convincing evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 62. This heightened standard is required because the termination of parental rights results in "a permanent and complete severance of the parent-child relationship" (*In re C.N.*, 196 Ill. 2d 181, 208 (2001)), thereby curtailing a fundamental liberty interest (see *In re C.N.*, 196 Ill. 2d at 216). If the circuit court finds a parent unfit, the proceedings move to the second step, at which the State must prove by a preponderance of the evidence that termination is in the children's best interests. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 73.

¶ 44    We give great deference to the circuit court's finding of unfitness because that court had the opportunity to observe and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). As such, we will not reverse the circuit court's finding of unfitness unless it is against the manifest weight of the evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 63. A finding of unfitness is against the manifest weight of the evidence only if the opposite conclusion is clearly evident from our review of the record. *In re Daphnie E.*, 368 Ill. App. 3d at 1064. We apply the same standard in reviewing the circuit court's best interest determination. *In re*

12

*Baby Boy*, 2025 IL App (4th) 241427, ¶ 74. With these principles in mind, we turn our attention to Father's arguments.

¶ 45                                    B. Unfitness

¶ 46    A parent may be found unfit if the State proves any one of the statutory grounds for unfitness by clear and convincing evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 63; see also 750 ILCS 50/1(D) (West 2024) (providing that, "The grounds of unfitness are *any one or more* of the following" (emphasis added)). As such, we may affirm the circuit court's decision if the evidence supports its finding of unfitness on any one of the grounds alleged. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 64.

¶ 47    In this case, the State alleged two grounds for unfitness: failure to make reasonable efforts to correct the conditions that led to the children's removal during any nine-month period following the adjudication of neglect or abuse (750 ILCS 50/1(D)(m)(i) (West 2024)) and failure to make reasonable progress toward the return of the children during any nine-month period following the adjudication of neglect or abuse (750 ILCS 50/1(D)(m)(ii) (West 2024)). The nine-month periods at issue for both reasonable efforts and reasonable progress are December 9, 2023, to September 9, 2024, and March 15, 2024, to December 15, 2024.

¶ 48    Failure to make reasonable efforts and failure to make reasonable progress are two distinct grounds for parental unfitness. *In re Daphnie E.*, 368 Ill. App. 3d at 1066. We assess a parent's reasonable efforts by a subjective standard based on the amount of effort that is reasonable for the particular parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1066-67. By contrast, we measure reasonable progress by an objective standard. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. "At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." *In re Daphnie E.*, 368 Ill. App. 3d at 1067. A parent has made reasonable progress

13

toward the return of the child when the circuit court, "in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 49 Father first argues that many of the requirements in his service plans were "not reasonably related to the reasons the children were brought into the care and custody of DCFS." In support of his contention that this was improper, Father cites section 8.2 of the Abused and Neglected Child Reporting Act. That statute governs service plans and provides, in pertinent part, as follows: "No service plan shall compel any child or parent to engage in any activity or refrain from any activity which is not reasonably related to remedying a condition or conditions that gave rise *or which could give rise* to any finding of child abuse or neglect." (Emphasis added.) 325 ILCS 5/8.2 (West 2024). We reject this argument for two reasons.

¶ 50 First, the prohibition contained in the statute is not as broad as Father's argument suggests. By its express terms, the statute does not preclude service plan goals related to problems that arise or come to light after the children are taken into care, such as the requirement that Father take parenting classes. As the Illinois Supreme Court explained, "the condition resulting in removal of the child may not be the only, or even the most severe, condition which must be addressed before custody of the child can be returned to the parent." *In re C.N.*, 196 Ill. 2d at 216. A finding of unfitness should never be based on a parent's failure "to comply with administrative directives unrelated to remedying a condition which would prevent return of the child." *In re C.N.*, 196 Ill. 2d at 215. However, we measure a parent's reasonable progress in terms of compliance with service plan requirements and court orders "in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d at 216-17.

14

¶ 51    Second, Father does not specify which requirements were not reasonably related to conditions he needed to correct before the children could be returned to his care. His failure to explain the reasons for his argument that the services required of him were improper results in forfeiture of that claim on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 52    Next, Father asserts that he "made satisfactory progress with all services aside from proof of income *** and stable housing." As we explained earlier, his unsatisfactory ratings on this goal stem from his refusal to provide proof of income and allow a home safety check. Father argues that this should not serve as a basis for finding him unfit because (1) the service plans indicate he reported being self-employed, and providing proof of income is difficult for a self-employed individual; (2) having a low income is not a proper basis for a finding of unfitness; and (3) it was not his fault the caseworkers "chose" not to inspect his home. We note that Father's claim that caseworkers simply "chose" not to conduct the home safety check is contradicted by the record. However, we need not consider Father's arguments concerning the propriety of the unsatisfactory ratings he received toward this goal because, contrary to Father's assertion, proof of income and housing was far from the only goal on which he failed to make reasonable efforts or progress.

¶ 53    In October 2024, Vogler rated Father's progress on seven of his nine service plan goals as unsatisfactory. He questions the propriety of two of those ratings. First, he contends that his caseworker "purposely set [him] up for failure" on the goal of participating in a psychological assessment because she offered him a ride to the scheduled assessment and then withdrew the offer. As we discussed previously, however, Vogler offered to provide Father with an Uber to take him to the psychological assessment, but he turned down that offer. Second, Father argues that he cannot be rated as unsatisfactory for failing to engage in counseling with a licensed sex offender treatment provider where the caseworker "cannot confirm" his participation. However, Vogler

15

testified that she was unable to obtain signed release forms from both parents that would have enabled her to verify their participation in services. A parent's refusal to sign release forms is a valid reason to find their progress unsatisfactory. See *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 66. Moreover, Father does not address the remaining services where his progress was likewise rated as unsatisfactory.

¶ 54     Finally, Father argues that the evidence "suggests that Father may not have been fully apprised of his recommended services." He contends that he cannot be found unfit for failing to engage in services he did not know were required. In support of his argument, Father cites this court's recent decision in *In re Charlie V.*, 2025 IL App (5th) 241085-U.[4] We find that case distinguishable.

¶ 55     There, the respondent father completed nearly all required services. *In re Charlie V.*, 2025 IL App (5th) 241085-U, ¶ 27. His home was safe, he was employed, and he demonstrated good parenting skills during his visits with the children. *In re Charlie V.*, 2025 IL App (5th) 241085-U, ¶ 27. The caseworker's lone concern regarding his parenting skills was his need to learn how to set boundaries with the children's mother. *In re Charlie V.*, 2025 IL App (5th) 241085-U, ¶ 27. The caseworker also indicated that returning the children to the father would have been appropriate if he took "decisive action" in response to the risks posed to the children by their mother's new romantic relationship. *In re Charlie V.*, 2025 IL App (5th) 241085-U, ¶ 26. However, the father's service plan contained no indication of what "decisive action" he was required to take or what boundaries he should set with the mother. *In re Charlie V.*, 2025 IL App (5th) 241085-U, ¶¶ 26-27. It was in this context that we held that the father's "failure to take an unknown 'decisive action'

_____

[4]Cited as persuasive authority pursuant to Illinois Supreme Court Rule 23(e)(1) (eff. June 3, 2025).

or set boundaries of an unknown nature[ ] cannot be the basis for finding of unfitness for failure to make reasonable progress." *In re Charlie V.*, 2025 IL App (5th) 241085-U, ¶ 28.

¶ 56     Here, by contrast, Father made unsatisfactory progress on nearly every goal in his service plan, and the only indication he might not have been fully apprised of any task required of him was evidence that Vogler had been unable to reach him to review the requirement that he engage in counseling with a licensed sex offender treatment provider. Vogler's inability to contact Father to review this requirement was largely due to his own refusal to communicate with her and his pattern of belligerence toward social service workers. Additionally, although Vogler was unable to discuss the requirement with Father, the evidence indicates he was aware that the requirement existed. Vogler testified that Father or Mother sent her a picture of the October 1, 2024, service plan, which included that requirement. Moreover, in view of Father's unsatisfactory progress on other services, the finding of unfitness for failure to make reasonable progress was not based solely on a failure to comply with this task, even assuming Vogler failed to fully apprise him of the requirement.

¶ 57     Most importantly, Father was unwilling to acknowledge that the abuse occurred or to recognize the trauma responses of his children, as Vogler noted both in her testimony and in her evaluations of his progress in the service plans. Due in large part to these deficits, Father was not allowed to have even supervised visitation with any of his children at the time the unfitness hearing occurred, thereby making it extremely unlikely the children could be returned to his care anytime soon. See *In re Ka. F.*, 2023 IL App (4th) 230496-U, ¶ 39 (upholding a finding that a father failed to make reasonable progress where he "never progressed to unsupervised visits and his ability to have the children in his custody in the near future was questionable").[5] Reasonable progress toward

---

[5]Cited as persuasive authority pursuant to Illinois Supreme Court Rule 23(e)(1) (eff. June 3, 2025).

the return of the child requires compliance with service plans and court orders that "is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in the original.) *In re L.L.S.*, 218 Ill. App. 3d at 461. This evidence provides ample support for the circuit court's finding of unfitness based on failure to make reasonable progress. Because we may affirm the circuit court's decision if the evidence supports even one statutory ground for unfitness (*In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 64), we need not consider whether the evidence likewise supports a finding of unfitness based on failure to make reasonable efforts.

¶ 58                                             C. Best Interests

¶ 59     Once a parent has been found unfit, the focus shifts from the parent to the child. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 73. During the best interest phase, the parent's interest in maintaining a relationship with the child "must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004).

¶ 60     In deciding whether termination of parental rights is in a child's best interests, the circuit court must consider several statutory factors, including (1) the child's physical safety and welfare; (2) the child's sense of attachment; (3) the need for permanence and stability and the continuity of the child's relationships with parental figures, siblings, and other family members; and (4) the preferences of the individuals available to provide care. 705 ILCS 405/1-3(4.05) (West 2024). The circuit court may also consider the likelihood of the child being adopted. *In re Za. G.*, 2023 IL App (4th) 220793, ¶ 54. Although the circuit court must consider all applicable statutory factors, it is not required to refer to each individual factor in rendering its decision. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 61       In support of his claim that the circuit court's best interest finding was against the manifest weight of the evidence, Father points out that neither party asked the circuit court to take judicial notice of the unfitness hearing. As such, he contends, the court was limited to considering the evidence presented at the best interests hearing. However, Father does not point to any evidence he believes the court considered improperly. Thus, he has forfeited consideration of any such claim. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (providing that points not argued in an appellant's brief are forfeited).

¶ 62       The remainder of Father's argument concerning the children's best interests focuses on the children's placement in separate foster homes. He argues as follows: "Each sibling was separated and therefore upon adoption, none of these children would legally be siblings. How can it be in the best interest of a child to separate him or her from one's biological siblings? It is not best." We are not persuaded.

¶ 63       Although Father cites no authority in support of his position, we recognize that there is authority for the proposition that maintaining siblings' relationships with each other is in their best interests. See 705 ILCS 405/1-3(4.05)(g) (West 2024). Here, however, there was evidence that separate placements were in the children's best interests due to behaviors they triggered in each other resulting from the sexual abuse they experienced. In addition, there was ample evidence that their sibling bond would be preserved after adoption. The children continued to attend scheduled sibling visitations. See *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 67 (finding support for a circuit court's best interest determination, in part, from evidence that the foster parents were facilitating contact between the separately placed siblings). In addition, many of them attended the same school and the same church, and three of the children were placed with relatives. Most importantly, the evidence established that all the children were happy and well-adjusted in their foster homes.

19

In view of this, we conclude that the circuit court's finding that termination of Father's rights was in the children's best interest was supported by the evidence.

¶ 64                              III. CONCLUSION

¶ 65    For the foregoing reasons, we affirm the judgment of the circuit court.


¶ 66    Affirmed.