NOTICE
Decision filed 11/25/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250573-U

NOS. 5-25-0573, 5-25-0574 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* ALEIGHA L. and DANIEL D., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois. | ) | Montgomery County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 22-JA-6, 22-JA-7 |
| | ) | |
| Megan G., | ) | Honorable |
| | ) | Dennis R. Atteberry, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justices Sholar and Hackett concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the circuit court's orders terminating respondent's parental rights where the evidence supports the circuit court's findings.

¶ 2    Respondent, Megan G., appeals orders of the Montgomery County circuit court terminating her parental rights to two of her children.[1] She argues that (1) the circuit court erroneously changed the permanency goal to substitute care pending termination of parental rights, thereby undermining her ability to make both reasonable efforts to correct the conditions that led to the children's

---

[1]Respondent filed separate appeals in each of the children's cases. This court subsequently entered an order consolidating the appeals.

1

removal and reasonable progress toward their return; and (2) the court's unfitness findings were against the manifest weight of the evidence. We affirm the orders of the circuit court.

¶ 3                                                  I. BACKGROUND

¶ 4        On March 18, 2022, the State filed petitions for adjudication of wardship for all three of respondent's children, Aleigha L. (born June 2009), Ryleigh G. (born January 2013), and Daniel D. (born September 2014).[2] The petitions alleged that (1) the children were neglected due to an environment injurious to their welfare (705 ILCS 405/2-3(1)(b) (West 2022)) because respondent was an admitted user of methamphetamine; and (2) the children were neglected due to respondent's failure to provide proper or necessary care for their well-being (*id.* § 2-3(1)(a)) because her residence had no kitchen sink, multiple holes in the kitchen floor, and "apparent feces on the carpet." On the same date, the State filed applications for shelter care containing the same allegations. The children were taken into care after a shelter care hearing the same day. On May 18, 2022, the circuit court held an adjudicatory hearing. Respondent waived the hearing and admitted to the allegations in the petitions. The same day, the court entered adjudicatory orders finding the children to be neglected.

¶ 5        On June 1, 2022, the matter came for a dispositional hearing. Respondent did not object to placing custody and guardianship of her children with the Department of Children and Family Services (DCFS) at that time. The court found that it would be in the best interests of all three children to place them in the custody and guardianship of DCFS with a goal of return home within 12 months. The court entered dispositional orders making the children wards of the court that day.

----

[2]The petitions also named each child's father. None of the fathers are parties to this appeal. In addition, as we discuss below, parental rights to Ryleigh G. have not been terminated. Although the three cases are factually intertwined, Ryleigh's case is not before us on appeal.

¶ 6    The circuit court held the first permanency review hearing on November 16, 2022. The court found that respondent made reasonable efforts, but she did not make substantial progress. The goal for all three children was return home within 12 months. The court entered a permanency order to that effect on November 30, 2022.

¶ 7    The second permanency review hearing took place on May 3, 2023. This time, however, the court found that respondent failed to make both reasonable efforts and substantial progress. The goal remained return home within 12 months. The same day, the court entered a written permanency order containing these findings.

¶ 8    On October 11, 2023, permanency hearing reports were filed with the circuit court in anticipation of the next scheduled permanency review hearing. The reports indicated that between November 2022 and July 2023, respondent did not maintain contact with Kemmerer Village Community Services, the DCFS contracted agency providing her with services; she did not meet with her caseworker, Sydney Jones, during the same period; and respondent missed two scheduled visitation sessions with the children in March 2023. The reports stated, however, that respondent "made some effort toward reunification" and that she had been "more cooperative" in communicating with her caseworker since July 2023.

¶ 9    The reports noted that in September 2023, respondent's visits with the children were moved to the Taylorville Police Department due to safety concerns. The concerns resulted from a "heated phone discussion" on August 29, 2023, during which a man believed to be respondent's stepfather could be heard in the background saying, "those mother f*** think they're so high and mighty, that's why they get killed."[3]

---

[3]Respondent later indicated that the man who said this was her brother.

¶ 10    The permanency reports summarized respondent's progress with substance abuse counseling, mental health counseling, and parenting classes as follows: During a September 12, 2023, telephone call, someone from the Montgomery County Health Department informed the caseworker that respondent resumed substance abuse counseling on July 24, 2023, and was attending her sessions regularly at that time. Although respondent told her caseworker that she was also participating in mental health counseling, the reports indicated that her caseworker was unable to confirm this with the provider. With respect to parenting classes, the reports indicated that respondent was referred for parenting classes on five different occasions—June 3, 2022; August 29, 2022; January 23, 2023; April 1, 2023; and August 10, 2023. After the first three referrals, she began taking classes but was subsequently dropped for failure to attend all required sessions. Respondent failed to engage at all after the fourth referral. As of the date of the report, however, she was engaging and attending classes.

¶ 11    The reports included a summary of respondent's history of drug tests. In particular, they noted that she tested positive for methamphetamines and THC on July 20, 2023, and she tested positive for THC on August 29, 2023, and September 20, 2023.

¶ 12    The report filed in Aleigha's case noted that she was placed with her maternal great-grandmother. The report in Daniel's case noted that Daniel was originally placed with his maternal great-grandmother as well, but he was subsequently "moved due to space issues and behavioral issues." At the time of the report, he was placed with his paternal grandmother and was doing well in that placement. Both reports included a recommendation that the goal for Aleigha and Daniel be changed to substitute care pending termination of parental rights.

¶ 13    The third permanency review hearing took place on October 25, 2023. The State argued that the goal of return home within 12 months remained appropriate for Ryleigh due to the

4

involvement of her father, James M. The State argued, however, that the goal for Aleigha and Daniel should be changed to substitute care pending termination. The State emphasized that the children had been in care for a long time and that respondent had not been in compliance for "a substantial period of that." It noted that that neither Aleigha's nor Daniel's father had made progress toward having any contact with a service provider. In addition, the State noted that respondent tested positive for THC and methamphetamine on July 20, 2023.

¶ 14 Respondent requested that the goal for all three children remain return home. Counsel acknowledged that returning the children to respondent's care was not yet feasible. She argued, however, that respondent was "starting to work her plan in a better way right now."

¶ 15 The circuit court ruled that the goal for Ryleigh would remain return home within 12 months. However, the court changed the goal for Aleigha and Daniel to substitute care pending termination of parental rights. The court entered written orders to that effect the same day.

¶ 16 On April 17, 2024, the State filed petitions to terminate respondent's parental rights to Aleigha and Daniel. In the petitions, the State alleged that respondent was unfit for (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) failure to make reasonable efforts to correct the conditions that led to the children's removal within any nine-month period after adjudication of neglect (*id.* § 1(D)(m)(i)); and (3) failure to make reasonable progress toward the return of the children within any nine-month period following adjudication of neglect (*id.* § 1(D)(m)(ii)). The State also sought to terminate the parental rights of Aleigha's father, James L., and Daniel's father, Daniel D.[4]

---

[4]Although Daniel and his father have the same first name and last name, respondent explained that they are not "Junior" and "Senior." To avoid confusion, we will refer to respondent's son as Daniel and to his father as Daniel D. or Daniel's father.

¶ 17    On November 6, 2024, the matter came for a hearing on the petitions to terminate. In Aleigha's case, the State requested default findings of unfitness against both respondent and James L. because they failed to appear in court for the hearing. Over the objection of respondent's attorney, the circuit court made default findings of unfitness against both respondent and James L. The court next found that termination of parental rights was in Aleigha's best interests by default, noting that this finding was likewise over the objection of respondent's attorney.

¶ 18    In Daniel's case, the circuit court noted that the record indicated that the father had not been served. The State's attorney explained that he attempted to serve the father, but the summons was returned as "unable to be served." He requested an order allowing service by publication on Daniel's father. The court granted the State's request for service by publication and set the matter for a further hearing on the petition to terminate parental rights in Daniel's case.

¶ 19    The circuit court entered an order terminating respondent's parental rights to Aleigha on November 6, 2024, noting that she failed to appear for the hearing. The order also terminated James L.'s parental rights on the same basis.

¶ 20    On December 6, 2024, respondent filed a motion to vacate the order terminating her parental rights. The circuit court granted that motion when the matter came for the next hearing on December 11, 2024. At the same hearing, the court found Daniel D. in default and terminated his parental rights to Daniel by default that day.

¶ 21    On April 23, 2025, the State filed supplemental petitions to terminate respondent's parental rights. The supplemental petitions did not make any substantive changes to the allegations against respondent in the original petitions; however, they identified the following nine-month periods for the allegations that respondent failed to make reasonable progress: February 18, 2023, to November 18, 2023; November 18, 2023, to August 18, 2024; and August 18, 2024, to May 18,

2025. The petitions also alleged that respondent failed to make reasonable progress within nine months of adjudication of wardship. In addition, the supplemental petitions alleged that both fathers were previously found in default.

¶ 22    On May 21, 2025, the circuit court held another hearing on the petitions to terminate respondent's parental rights to Aleigha and Daniel. The children's guardian *ad litem* called Aleigha and Ryleigh to testify at their request. At the time of the hearing, Aleigha was a month away from turning 16 and Ryleigh was 12 years old.

¶ 23    Aleigha testified that she wanted to stay with her grandmother because she felt "much safer" there than she did at her mother's house.[5] Asked why she felt unsafe in her mother's home, Aleigha explained, "She had too many guys over and people that just I didn't trust, people who I heard them talking to my mom about that were like from prison and stuff." She further testified that the children found knives outside their bedrooms.

¶ 24    Aleigha testified that respondent and her boyfriends would beat the children. She noted that respondent often became angry if any of the children needed anything from her while she was in her bedroom with her boyfriend. This would lead to beatings. Aleigha described one incident in which respondent and her then-boyfriend, Caleb, stripped Daniel naked and beat him. She testified that if she tried to say anything to respondent about the abuse of Daniel, respondent would hit her with objects such as hangers or spoons. She noted that sometimes respondent would break the objects she used to hit her children.

¶ 25    According to Aleigha, the most consistent source of food for the children was their school. She testified, "The school would send us [home] with bread and peanut butter and stuff like that

---

[5]Aleigha and Ryleigh were placed with their maternal great-grandmother, Shelly Austin. They remained in that placement throughout these proceedings. However, respondent, Aleigha, and Ryleigh all referred to Austin as "grandma" or "grandmother" in their hearing testimony.

that we could easily make ourselves, like microwaveable mac and cheese and stuff." Aleigha testified that respondent became angry when she found out about the food being sent home. Respondent told Aleigha that the children would be taken from her because of their "lying about what's going on here at home."

¶ 26 Describing the conditions in her mother's home, Aleigha noted that there were bugs and mice in the trailer and dog urine and feces in the hallways. She stated that they frequently did not have running water. As a result, the children's clothing was dirty, and they had to go somewhere else to brush their teeth and take showers.

¶ 27 Ryleigh likewise testified that respondent's home was dirty and that she did not feel safe living there. Asked what made her feel unsafe, she replied, "Just all the times that we got beat ***." She testified that she feared for Daniel's safety, explaining that "him and Aleigha are the ones that got it the worst." Ryleigh confirmed Aleigha's testimony that respondent and her boyfriend stripped Daniel naked and beat him. She further testified, "Whenever Caleb got really bad I had to hear Daniel screaming and yelling for me and Aleigha to help, well, for Aleigha to help him."

¶ 28 Ryleigh testified that she wanted to continue living with her grandmother and did not want to go back to respondent's home. She felt safe and loved with her grandmother. Asked to describe the difference between living with her grandmother and her mother, Ryleigh replied, "At grandma's house I actually get fed." In addition, she explained that she got "love and attention as much as a little kid needs and even more," something she did not get at her mother's home.

¶ 29 The State called respondent to testify as an adverse witness. Respondent acknowledged that the children were initially taken into care due to allegations that she was using drugs and her "home was not appropriate for them." She further acknowledged that at the adjudicatory hearing,

8

she admitted the allegations in the petition. Asked how long she had been using methamphetamine, respondent replied, "I don't know. Off and on. It wasn't a continuous use, probably for like maybe the last five years or so, but it was off and on." She testified that the last time she used methamphetamine was approximately December 2024. She acknowledged, however, that she tested positive for methamphetamine while the children were in DCFS care and that the test results were accurate.

¶ 30    Respondent testified that her service plan required her to complete substance abuse treatment, parenting classes, a mental health assessment, and drug screens, and to attend visits with her children, communicate with her caseworker, and attend court dates. She acknowledged that the agency provided her with referrals for parenting classes and that she did not successfully complete a parenting class until January 2024 after her third referral.[6] Respondent did not recall why she failed to complete parenting classes after the first referral. She testified that she failed to complete the classes after the second referral because she missed two classes and "you could only miss two."

¶ 31    Next, respondent was asked about substance abuse treatment. She testified that she was referred to the Montgomery County Health Department for an assessment, which she completed. The assessor's recommendation was to complete 30 hours of counseling. Respondent testified that she completed only 27 of the 30 hours recommended. She did not recall "what happened," but she believed she stopped attending around the time her mother was in the hospital with a serious illness. Respondent explained that after she "failed to do the full 30 hours the first time," she was required to start over with a new assessment. The second assessment took place in September

_____

[6]As mentioned earlier, the October 11, 2023, permanency report indicated that respondent was referred for parenting classes five times. However, while the report was filed with circuit court and considered at the permanency hearing of October 25, 2023, it was not entered into evidence at the termination hearing.

2022, and once again resulted in a recommendation for 30 sessions. Again, respondent failed to complete the recommended counseling. She explained that at the time, she was serving a sentence of probation for an eight-year-old felony conviction, and she was arrested for missing a court date in her criminal case after completing approximately 27 sessions. Respondent testified that in March 2025, she started with a third provider, St. Francis Way. However, she acknowledged that as of the time of the hearing, she still had not completed substance abuse treatment.

¶ 32 Respondent testified that she was initially supposed to complete mental health counseling and substance abuse counseling together. As a result, the same time frames applied to her previous attempts to complete both substance abuse treatment and mental health counseling. Respondent clarified that she began shortly after the children were taken into care, but did not complete counseling, and that she engaged again in September 2022, but was unable to finish because of her arrest and subsequent incarceration. Respondent testified that she began looking for a new provider for mental health counseling in March of 2025, but as of the time of the hearing, she had not found a provider. It is not clear why she was unable to receive both substance abuse and mental health counseling from St. Francis Way. When asked, she simply stated that St. Francis Way's substance abuse program was more in-depth than the other programs she had attempted.

¶ 33 Respondent next testified concerning her relationship with her caseworkers. She testified that she had only two caseworkers—Sydney Jones, who served as her caseworker for most of the time her children were in care, and Katie Galbraith (now known as Katie Zike), who replaced Jones sometime in 2024. Respondent admitted that she did not keep in contact with Jones "very well." In addition, she noted that her telephone number "changed pretty often." The State asked, "Did you ever have any issues with Sydney not—not helping you when you did ask for help?"

Respondent replied, "[N]o, not really. Maybe if I would have stayed in contact better, things would have been different."

¶ 34    Respondent testified that she missed one scheduled visit with her children due to illness, but she attended all other visits. She acknowledged that she missed a few court dates even though attending court dates was one of her service plan goals. She testified, however, "I think I've attended most of them." Finally, respondent acknowledged that she decided to "turn things around" only after her parental rights to Aleigha were terminated in November 2024.

¶ 35    On cross-examination by her own attorney, respondent testified that she adored her children. As of the time of the hearing, she had been working at a local McDonald's for approximately three months. She and her current boyfriend were living with her mother, but she was looking for a house to rent.

¶ 36    The State asked the circuit court to take judicial notice of the adjudicatory and dispositional orders. The court did so without objection. The court also admitted into evidence State's Group Exhibit 1, which consisted of respondent's service plans, for the limited purpose of establishing what tasks respondent was required to complete.

¶ 37    On May 22, 2025, the circuit court entered a "Stage One Fitness Order" containing detailed written findings. The court first addressed the allegations that respondent failed to make both reasonable efforts and reasonable progress. The court noted that respondent completed parenting classes on her third attempt and twice completed 27 of the 30 sessions for mental health and substance abuse treatment. The court emphasized, however, that "addressing an issue isn't about checking off a box. It is also about implementation." The court noted that the primary issue in this case was respondent's addiction, and respondent acknowledged that she did not have her addiction under control until December 2024. The court noted that her failure to address her addiction

11

encompassed the first two nine-month periods at issue and found that respondent did not "substantially complete the necessary steps to correct the condition that brought the minor[s] into care" during any of the three nine-month periods.[7]

¶ 38    The circuit court next addressed the allegation that respondent failed to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare. The court recognized that respondent's completion of parenting classes and visitation with the children demonstrated "some interest or concern or responsibility" for their welfare. However, the court emphasized that the issue was not whether she demonstrated *any* interest, concern, or responsibility, but whether her interest, concern, and responsibility was *reasonable*. The court reiterated that respondent twice failed to complete counseling and noted that she "never demonstrated application of her mental health or sobriety until December of 2024." The court also highlighted respondent's admission that she might have been more successful if she had kept in touch with her caseworker. Finally, the court found that respondent's failure to appear at the November 2024 termination hearing was "the most telling of all." The court thus found that respondent was unfit.

¶ 39    On June 17, 2025, the matter proceeded to a best interest hearing. The circuit court heard the testimony of Aleigha's foster mother, Daniel's foster mother, and the children's caseworker, Katie Zike. Because respondent challenges only the circuit court's finding of unfitness and does not challenge the best interest determination, we defer discussion of this testimony. In addition to hearing testimony, the court took judicial notice of Aleigha and Ryleigh's testimony from the earlier hearing and of the pretrial investigation report filed in a pending criminal proceeding against

_____

[7]Although the petition to terminate alleged that respondent failed to make reasonable efforts during the initial nine months after adjudication of neglect as well as the three subsequent nine-month periods, the circuit court appears to have focused solely on the three subsequent periods.

respondent's boyfriend, Earl Elwood, which indicated that Elwood had prior convictions for violent felonies and possession of methamphetamine. Announcing its ruling from the bench, the circuit court found that it was in the best interests of both Aleigha and Daniel to terminate respondent's parental rights.

¶ 40    The circuit court made its written best interest findings by docket entries dated June 17 and June 25, 2025. This timely appeal followed.

¶ 41                                    II. ANALYSIS

¶ 42    Respondent argues that (1) the circuit court erred in changing her goal to substitute care pending termination in October 2023, thereby "derailing" the progress she made in the preceding three months and depriving her of the services she needed to make reasonable efforts and reasonable progress; and (2) the court's finding that she failed to maintain a reasonable degree of interest, concern, or responsibility was against the manifest weight of the evidence. We reject both contentions.

¶ 43                    A. Applicable Law and Standard of Review

¶ 44    Terminating parental rights involves a two-step process. First, the State must prove that the respondent parent is unfit by clear and convincing evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 62. If the circuit court finds a parent unfit, the proceedings progress to the second step, during which the State must prove by a preponderance of the evidence that termination of parental rights is in the children's best interests. *Id.* ¶ 73.

¶ 45    We give great deference to the circuit court's unfitness findings because the circuit court had the opportunity to observe and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). As such, we will reverse a finding of unfitness only if it is against the manifest weight of the evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 63. A decision

13

is against the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 46 Here, the State alleged three grounds for unfitness: (1) failure to make reasonable efforts to correct the conditions that led to the children's removal during any nine-month period following the adjudication of neglect or abuse (750 ILCS 50/1(D)(m)(i) (West 2024)); (2) failure to make reasonable progress toward the return of the children during any nine-month period following the adjudication of neglect or abuse (*id.* § 1(D)(m)(ii)); and (3) failure to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare (*id.* § 1(D)(b)). Because a parent may be found unfit if the State proves any one of the statutory grounds for unfitness by clear and convincing evidence, we will affirm the circuit court's decision if the evidence supports its finding as to any of the grounds alleged. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶¶ 63-64.

¶ 47                              B. Reasonable Efforts and Reasonable Progress

¶ 48 Failure to make reasonable efforts to correct the conditions that brought the children into care and failure to make reasonable progress toward their return are two distinct grounds for parental unfitness. *In re Daphnie E.*, 368 Ill. App. 3d at 1066. We assess a parent's reasonable efforts by a subjective standard based on the amount of effort that is reasonable for the particular parent. *Id.* at 1066-67. By contrast, we measure reasonable progress by an objective standard. *Id.* at 1067. The benchmark for measuring reasonable progress "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later became known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). "At a minimum, reasonable progress requires measurable or demonstrable

14

movement toward the goal of reunification." *In re Daphnie E.*, 368 Ill. App. 3d at 1067. A parent has made reasonable progress when the circuit court, "in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 49 Here, ample evidence supported the circuit court's findings that respondent failed to make both reasonable efforts and reasonable progress during any nine-month period after adjudication of neglect. By her own admission, she did not complete substance abuse counseling or mental health counseling during any of the nine-month periods at issue. Respondent also admitted that she continued using methamphetamine "off and on" until December 2024. Thus, her admitted failure to address one of the primary reasons the children were removed spanned all but the latter half of the last nine-month period at issue. Although respondent completed parenting classes in January 2024, her failure to do so earlier encompassed the entire initial nine-month period after adjudication of neglect (May 18, 2022, to February 18, 2023), all of the next nine-month period (February 18, 2023, to November 18, 2023), and part of the third nine-month period (November 18, 2023, to August 18, 2024).

¶ 50 Respondent argues, however, that the circuit court's decision to change the permanency goal to substitute care pending termination deprived her of the services she needed to complete the tasks required of her. She further argues that the court's decision to change the goal was "against the manifest weight of the evidence at the time." We reject these contentions.

¶ 51 Although not cited by respondent, there is authority for the proposition that a parent cannot be found unfit for failure to make reasonable efforts or reasonable progress where DCFS or its contracted agency have not provided a service plan or apprised the parent of its requirements. *In re T.D.*, 268 Ill. App. 3d 239, 247 (1994); see also *In re Charlie V.*, 2025 IL App (5th) 241085-U,

15

¶ 28; *In re K.G.*, 2023 IL App (5th) 230148-U, ¶ 32.[8] Here, however, respondent's service plan goals remained the same after the permanency goal was changed. As such, respondent cannot claim she was unaware of the tasks she needed to complete in order to correct the conditions and regain custody of her children.

¶ 52 We recognize that DCFS is not required to provide reunification services once the permanency goal is changed to substitute care pending termination. *In re Curtis B.*, 203 Ill. 2d 53, 62 (2002); *In re A.P.-M.*, 2018 IL App (4th) 180208, ¶ 35. In addition, although the permanency goal must be reviewed every six months (705 ILCS 405/2-28(2) (West 2024)) and remains subject to reevaluation and revision (*In re Curtis B.*, 203 Ill. 2d at 59-60), we also recognize that "as a practical matter, in many cases, it is unlikely that the goal of termination, once set, will be changed." *In re Curtis B.*, 203 Ill. 2d at 62. As our supreme court has observed, "For the indigent parent, the entry of a permanency goal of termination of parental rights is *** doubly critical. Not only is the legal path set for termination but, in addition, state-funded counseling and other services are no longer available." *Id.* In this case, however, because the goal for Ryleigh remained return home within 12 months, respondent continued to receive services as required. Significantly, when asked whether her first caseworker ever failed to provide any assistance she requested, respondent replied, "no."

¶ 53 Further, contrary to respondent's contention, we believe the evidence supported the circuit court's decision to change the permanency goal for Aleigha and Daniel in October 2023. As respondent points out, the permanency report filed with the court indicated that she began communicating more regularly with her caseworker in July 2023. The report further indicated that

[8]We cite *In re Charlie V.* and *In re K.G.* as persuasive authority pursuant to Illinois Supreme Court Rule 23(e)(1) (eff. Jan. 1, 2021).

she resumed parenting classes and substance abuse counseling around the same time. However, the report also indicated that respondent fell short in many other areas, such as obtaining suitable housing for the children, engaging in mental health counseling, and testing negative for drugs. "A parent does not have an unlimited period of time in which to make reasonable efforts or progress toward regaining custody of their children." *In re Grant M.*, 307 Ill. App. 3d 865, 871 (1999).

¶ 54 Moreover, respondent's argument would fail even if we accepted her contention that the decision to change the permanency goal erroneously deprived her of needed assistance in satisfying the requirements of her service plans. The circuit court may find a parent unfit based on failure to make reasonable efforts or progress during *any* nine-month period following adjudication. 750 ILCS 50/1(D)(m) (West 2024). The permanency goal was return home within 12 months throughout the initial nine-month period (May 18, 2022, to February 18, 2023) and for the first eight months of the second nine-month period (February 18, 2023, to November 18, 2023). Thus, the court's findings with respect to these periods were not affected by the change in the permanency goal. For these reasons, we conclude the evidence supported the circuit court's findings that respondent failed to make both reasonable efforts and reasonable progress.

¶ 55 C. Reasonable Degree of Interest, Concern, or Responsibility

¶ 56 Respondent likewise contends that the circuit court's finding that she failed to maintain reasonable interest, concern, or responsibility for her children's welfare was against the manifest weight of the evidence. We disagree.

¶ 57 In considering whether a parent is unfit for failing to maintain a reasonable degree of interest, concern, or responsibility for the welfare of the children, our "focus is on the parent's reasonable efforts more so than the parent's success." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 36. Thus, we must take into account circumstances that made it difficult for the parent to

17

demonstrate the requisite reasonable degree of interest, concern, or responsibility. *Id.* Significantly, however, a parent cannot avoid a finding of unfitness by showing *some* interest, concern, or responsibility; the question is whether the parent's interest, concern, or responsibility is *reasonable*. *In re M.I.*, 2016 IL 120232, ¶ 30. In addition, because the statutory language is disjunctive, any of the three elements may provide a basis for a finding of unfitness standing alone. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 36. That is, a parent may be found unfit for failing to maintain a reasonable degree of interest or concern or responsibility. *Id.*

¶ 58    Here, respondent attended visits with her children regularly and made at least some efforts to comply with her service plans. Thus, she clearly demonstrated some interest in her children's welfare. The question, however, is whether she maintained a reasonable degree of interest, concern, and responsibility. *In re M.I.*, 2016 IL 120232, ¶ 30; *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 36.

¶ 59    Respondent admitted that she continued using methamphetamine and failed to comply with the requirements of her service plans until the circuit court entered a default order terminating her parental rights to Aleigha in November 2024. As the circuit court emphasized, respondent did not even attend the November 2024 termination hearing.

¶ 60    We find additional support for the circuit court's finding in the testimony of respondent's daughters. Aleigha testified that respondent continued to smoke even though Aleigha suffered from asthma. She further testified that respondent blamed others for the problems that led to the children's removal. Aleigha eventually refused to continue visits with respondent as a result. Similarly, Ryleigh testified that respondent "barely ever" acknowledged that there were any problems in the home she provided for her children before they went into care, and she sometimes denied it outright. This evidence was sufficient to support the circuit court's finding that

18

respondent was unfit because she failed to demonstrate a reasonable degree of interest, concern, or responsibility for her children's welfare.

¶ 61                                        III. CONCLUSION

¶ 62    For the foregoing reasons, we affirm the orders of the circuit court terminating respondent's parental rights.


¶ 63    Affirmed.