NOTICE

Decision filed 01/27/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250710-U

NOS. 5-25-0710, 5-25-0711, 5-25-0712 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* HEAVENLY A., JOSIAH A., and SKYLAR A., Minors | ) ) ) | Appeal from the Circuit Court of Macon County. |
| (The People of the State of Illinois. | ) ) | |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | Nos. 20-JA-103, 21-JA-208, 22-JA-227 |
| Joseph A., | ) ) | Honorable Erick F. Hubbard, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Presiding Justice Cates and Justice Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the trial court's orders terminating the respondent's parental rights to his three children where the evidence supports the court's findings that he is an unfit parent and that termination of his rights was in the children's best interests.

¶ 2    The respondent, Joseph A., appeals orders of the circuit court of Macon County terminating his parental rights to his three minor children.[1] He challenges both the court's finding that he is unfit and its finding that termination of his rights is in the children's best interests, arguing that these findings were against the manifest weight of the evidence. We affirm.

---

[1]Joseph filed separate appeals in each of the children's cases. This court ordered his appeals consolidated under the case number for the oldest child's case.

1

¶ 3                                    I. BACKGROUND

¶ 4      On May 13, 2020, the State filed a petition for adjudication of wardship regarding Joseph's infant daughter, Heavenly A., who was born in late November 2019 and taken into protective custody by the Department of Children and Family Services (DCFS) on May 11, 2020. The petition also named Heavenly's mother, Chrystal A., as a respondent; however, Chrystal is not a party to this appeal. The petition alleged that Heavenly was abused or neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2020)) because she was in an environment injurious to her welfare due to ongoing substance abuse and domestic violence occurring in her presence. The petition further alleged that Heavenly was abused or neglected pursuant to section 2-3(2)(ii) of the Act (*id.* § 2-3(2)(ii)) in that her parents created a substantial risk of injury by other than accidental means. In support of both allegations, the State alleged that intact services had been tried and failed and that both parents had violated a no-contact order put in place after a recent incident of domestic violence.

¶ 5      A shelter care report filed with the court along with the petition described a May 4, 2020, incident in which officers responded to a 911 call from Chrystal reporting that Joseph was "out of control." When officers arrived, Chrystal told them that Joseph was "out of control" and was claiming that she cheated on him. When officers spoke to Joseph, Chrystal began yelling at them. She stated that Joseph could stay in the home, but that if he started arguing with her again, she would stab him. Joseph showed the officers three "claw marks" on the side of his neck, and officers observed that the skin on his neck was red and swollen and "just short of bleeding." Chrystal showed the officers bruising "that looked like finger marks." According to Joseph's teenage daughter, Hannah A., Joseph and Chrystal had been arguing since 5 a.m. the previous day. Both

2

Joseph and Chrystal were arrested and charged with domestic battery with prior domestic battery convictions.

¶ 6　　The court held a shelter care hearing on May 13, 2020. Both parents stipulated to the allegations of the petition. The court entered a temporary custody order that day.

¶ 7　　The matter came for an adjudicatory hearing on July 30, 2020. The court entered a written adjudicatory order that day finding Heavenly to be an abused or neglected minor based upon both an environment injurious to her welfare (*id.* § 2-3(1)(b)) and a substantial risk of physical abuse or injury (*id.* § 2-3(2)(ii)).

¶ 8　　On September 2, 2020, the court held a dispositional hearing. In a written dispositional order entered that day, the court found that both parents were unfit and unable to care for Heavenly due to substance abuse, domestic violence, and trauma-related mental health issues; that, in addition, Chrystal was unfit and unable to care for Heavenly due to the previous termination of her parental rights to her other children; and that it was consistent with the child's best interest to be made a ward of the court. However, the court also found that both parents were compliant with services and "doing well" at that time. The court made Heavenly a ward of the court with legal custody to DCFS; however, the court placed physical custody with the parents and ordered that Heavenly be returned to their care that day.

¶ 9　　On January 20, 2021, the first permanency report was filed with the court. The report indicates that an additional incident of domestic violence occurred after Heavenly was returned home. As a result, a DCFS investigator and supervisor determined that Heavenly should be returned to care. The report does not indicate precisely when that incident occurred.

¶ 10　　After a hearing, the court entered a permanency order on February 10, 2021. It found that both parents had made reasonable efforts toward the return of the child, but that neither parent had

3

made reasonable and substantial progress. The court set a goal of return home within 12 months. At the request of DCFS, the court set the next permanency review hearing to take place three months later, on May 5, 2021.

¶ 11    In April 2021, the parties' second child, Josiah, was born. He was not taken into care at that time.

¶ 12    After the May 5, 2021, permanency hearing, the court entered an order finding that both parents had made reasonable efforts and reasonable and substantial progress toward Heavenly's return to their care and that placement outside the home was no longer necessary. Legal custody was to remain with DCFS, but physical custody was returned to the parents. The goal remained return home within 12 months.

¶ 13    On October 19, 2021, a permanency review report was filed in Heavenly's case ahead of a scheduled hearing on November 3. The report indicated that no issues occurred between May 5, when Heavenly was returned home, and August 12, when an investigation was opened due to new allegations of domestic violence and substance abuse. The report noted that after that incident, an order of protection against Joseph was obtained, presumably by Chrystal. Joseph violated the order of protection on August 14, leading to his arrest. At the time of the report, Joseph remained incarcerated with a scheduled release date of October 25. The report recommended that Heavenly remain in aftercare with Chrystal.

¶ 14    On November 3, 2021, after a hearing, the court entered its next permanency order, finding that Chrystal made both reasonable efforts and reasonable and substantial progress towards the return of the child to her care; that Joseph made reasonable efforts, but did not make reasonable and substantial progress; and that placement outside the home was not necessary. The court

4

maintained a goal of return home within 12 months and ordered that legal custody remain with DCFS.

¶ 15    On November 28, 2021, DCFS took custody of both Heavenly and Josiah after another incident involving domestic violence. Two days later, the State filed a supplemental petition in Heavenly's case and filed a new petition for adjudication of wardship on behalf of Josiah. In both petitions, the State alleged that the children were neglected pursuant to section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2020)) because their environment was injurious to their welfare due to Joseph and Chrystal's "extensive history of substance abuse and domestic violence." The petitions further alleged that the children were abused pursuant to section 2-3(2)(ii) of the Act (*id.* § 2-3(2)(ii)) in that their parents created a substantial risk of injury to the children by other than accidental means. In support of both allegations, the State alleged that on November 27, 2021, Chrystal was hospitalized due to injuries and extreme intoxication; that both children's clothing was covered in blood stains and splatters; and Josiah's clothing was saturated in alcohol. The court entered temporary custody orders as to both children after a shelter care hearing the same day.

¶ 16    On January 12, 2022, the trial court entered an adjudicatory order in Josiah's case finding him to be neglected based on an environment injurious to his welfare. On the same date, the court entered a supplementary adjudicatory order in Heavenly's case finding her to be neglected on the same basis.

¶ 17    On January 26, 2022, the court entered a dispositional order in Josiah's case making him a ward of the court and a supplemental dispositional order in Heavenly's case continuing her status as a ward of the court. On the same date, the court entered a permanency order in Heavenly's case, finding that both parents failed to make either reasonable efforts or reasonable and substantial progress toward Heavenly's return to their care. The goal remained return home within 12 months.

5

¶ 18    On July 27, 2022, the court entered permanency orders in both open cases. The court found that both parents had made reasonable efforts toward the return of the children, but that neither parent made reasonable and substantial progress. The goal remained return home within 12 months.

¶ 19    Joseph and Chrystal's third child together, a son named Skylar, was born in early October 2022. At the time of Skylar's birth, Joseph and Chrystal had separated, and they informed their caseworker that they intended to get a divorce.

¶ 20    The State filed a petition for adjudication of wardship as to Skylar on October 19, 2022. The petition alleged that Skylar was neglected due to being in an environment injurious to his welfare (705 ILCS 405/2-3(1)(b) (West 2022)) and that he was abused due to his parents creating a substantial risk of injury by nonaccidental means (*id.* § 2-3(2)(ii)). In support of both allegations, the State asserted that both of the parents' older children were in care due to issues with substance abuse and domestic violence, and that the parents had not progressed enough with their services to warrant the return of the children to their care.

¶ 21    On the same date, the court entered a temporary custody order placing Skylar in the custody of DCFS and setting the matter for a first appearance hearing on November 16, 2022. At that hearing, Joseph and Chrystal admitted the allegations of the petition. The court entered an order that day continuing the cause under supervision (see *id.* § 2-20). The court ordered Skylar returned home and ordered the parents to cooperate with DCFS. Although the order did not specify which parent's home was to be Skylar's residence, a subsequent report filed with the court indicates that he lived with Joseph.

¶ 22    The court held the next permanency hearing regarding Heavenly and Josiah on January 25, 2023. In its permanency orders, the court found that continued placement in foster care was

appropriate for Heavenly and Josiah and that both parents had made reasonable efforts toward the return of the two children, but neither had made reasonable and substantial progress.

¶ 23    On March 8, 2023, the court entered permanency orders for Heavenly and Josiah, returning them to Joseph's physical custody that day. The court found that both parents had made reasonable efforts toward the return of the children and that Joseph had also made reasonable and substantial progress, but Chrystal had not.

¶ 24    On August 23, 2023, Chrystal came to Joseph's house and attacked him in the presence of the children. All three children were removed from the home by DCFS the following day.

¶ 25    On August 28, 2023, the State filed a petition to revoke supervision in Skylar's case, alleging that Skylar was neglected and/or abused by virtue of an environment injurious to his welfare and a risk of injury by nonaccidental means. After a shelter care hearing held that same day, the court entered a temporary custody order placing Skylar in the custody of DCFS.

¶ 26    On September 6, 2023, the court entered permanency orders in Heavenly and Josiah's cases. The court found that Joseph had made reasonable efforts but not reasonable and substantial progress toward the children's return and that Chrystal had not made either reasonable efforts or reasonable and substantial progress. The court ordered continued legal and physical custody with DCFS and maintained the goal of return home within 12 months.

¶ 27    On October 26, 2023, the court held an adjudicatory hearing in Skylar's case. In a docket entry, the court found Skylar to be neglected based on the allegation of an environment injurious to his welfare. Although the court stated that an order was to be filed, no separate written adjudicatory order was entered in the case.

¶ 28    Skylar's case proceeded to a dispositional hearing on November 1, 2023. On that date, the court entered a written dispositional order making Skylar a ward of the court.

7

¶ 29    On December 27, 2023, the court entered permanency orders in all three cases. The court found that Joseph made reasonable efforts but did not make reasonable and substantial progress, that Chrystal made neither reasonable efforts nor reasonable and substantial progress, and that continued placement outside the home was still necessary. The court maintained a goal of return home within 12 months.

¶ 30    The court's next permanency orders were entered on March 6, 2024. The court found that Joseph made both reasonable efforts and reasonable and substantial progress; that Chrystal, who was incarcerated at the time, did not make either reasonable efforts or reasonable and substantial progress; and that placement outside the home was still necessary. The court again maintained the goal as return home within 12 months.

¶ 31    The next permanency review occurred on June 12, 2024. The court again found that Joseph made both reasonable efforts and reasonable and substantial progress and that Chrystal did not make either reasonable efforts or reasonable and substantial progress. The court further found that the case was ready for aftercare with Joseph.

¶ 32    On November 27, 2024, DCFS filed a permanency report with the court in which it outlined events that led to the children being removed from Joseph's care again the previous month. According to the report, Chrystal was arrested in February 2024 and charged with criminal trespass to property with a person present and violating an order of protection. She was sentenced to 18 months in prison with a projected release date of November 15, 2024. However, Chrystal was released early on October 4, at which time she was paroled to Joseph's home, where the children had been placed for aftercare. On October 24, the caseworker made an unannounced home visit for a safety check after receiving a report that Chrystal was in the home. Due to Chrystal's presence in the home, all three children were removed that day and returned to a "fictive kin" foster care

placement. The report further indicated that Chrystal was subsequently reincarcerated with a projected release date of October 2028. The report recommended that the goal remain return home within 12 months.

¶ 33    On December 11, 2024, despite this recommendation, the court entered permanency orders changing the goal to substitute care pending determination of termination of parental rights. The court found that this goal change was appropriate because "aftercare failed again." In addition, the court found that both parents failed to make either reasonable efforts or reasonable and substantial progress.

¶ 34    On December 18, 2024, the State filed motions to terminate parental rights to all three children. The State alleged that both parents were unfit for (1) failure to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) depravity due to four prior felony convictions each (*id.* § 1(D)(i)); (3) failure to make reasonable efforts to correct the conditions that led to the children's removal during any nine-month period following adjudication of neglect (*id.* § 1(D)(m)(i)); and (4) failure to make reasonable progress toward the children's return during any nine-month period following the adjudication of neglect (*id.* § 1(D)(m)(ii)). The State identified the following nine-month periods for failure to make reasonable progress: October 26, 2023, to July 26, 2024, and March 12, 2024, to December 12, 2024. It did not specify a nine-month period for failure to make reasonable efforts.

¶ 35    The matter proceeded to a fitness hearing on June 16, 2025. At the outset, the court took judicial notice of each parent's previous convictions without objection.

¶ 36    The State called Gailan Leeds, a child welfare specialist with Lutheran Child and Family Services who served as the children's caseworker beginning October 9, 2024. Leeds noted that she also reviewed the records of the children's prior caseworkers.

¶ 37    Leeds first provided an overview of the case histories. She explained that Heavenly's case was opened in May 2020 due to substance abuse and domestic violence. Heavenly was returned to her parents' care in September 2020 but was subsequently removed again due to ongoing issues with substance abuse and domestic violence. Leeds stated that Heavenly was returned home a second time in May 2021 shortly after Josiah's birth, but Heavenly and Josiah were removed from the home in November 2021 due to the same issues. Skylar was initially taken into care at birth (in October 2022), but he was returned home under court supervision the following month. Heavenly and Josiah were also returned to Joseph's care in March 2023. Leeds testified that all three children were removed again in August 2023 following new incidents of domestic violence.

¶ 38    Leeds testified that the children were again returned to Joseph's care in June 2024. At that time, Chrystal was incarcerated on charges stemming from a November 2023 incident involving domestic violence. Leeds explained that the previous caseworkers and their supervisors "had several conversations" with Joseph in which they emphasized to him that Chrystal should not be allowed in the home or near the children. This was due, in part, to her ongoing issues with substance abuse. Leeds testified that, in spite of these conversations, Chrystal was paroled from prison into Joseph's home. She noted that Joseph previously obtained an order of protection against Chrystal, but he dropped the order in April 2024.

¶ 39    Leeds next testified at length about the services Joseph was required to complete. These included cooperation with caseworkers, counseling (and following any recommendations), substance abuse treatment, and drug tests. He was also required to engage in domestic violence services, "which were anger management courses." Leeds indicated that Joseph cooperated and engaged in these services. He completed parenting classes three times, successfully completed domestic violence and anger management services, and engaged in substance abuse services.

10

Leeds noted that Joseph stopped testing positive for any substances other than THC; however, she did not say when.

¶ 40    Leeds testified that when the children were returned to Joseph's care in August 2023, he was required to complete a "healthy relationships" program, which "teaches participants to engage in healthy relationships with partners, with children, with people in general to avoid domestic violence incidents." Leeds explained that the goal of the program was to help Joseph "choose appropriate partners to have around the children" and relationships that did not include domestic violence. She testified that although Joseph engaged in the program, he had difficulty applying what he learned to his life. She emphasized that Joseph had multiple conversations with previous caseworkers in which they made it clear to him that to keep the children safe, Chrystal could not be near them or in the home until she stayed sober for six months and completed services. Leeds reiterated that despite these conversations, Joseph allowed Chrystal to be paroled to his home. He told caseworkers that he allowed Chrystal to return because he wanted to keep his family together.

¶ 41    Although Joseph completed most of his services, Leeds explained that because the children were returned to foster care multiple times, DCFS recommended that he complete additional services. The additional services included "another round of parenting classes," a mental health assessment, a psychological evaluation, a parenting capacity assessment, and another healthy relationships class. Leeds noted that at the time of the hearing, Joseph had completed the mental health assessment and arranged to begin therapy.

¶ 42    Leeds opined that returning the children to Joseph's care in the near future "would pose a high risk to the children." Asked what Joseph must do before she would recommend returning the children to his custody, she testified that he would need to put physical distance between himself and Chrystal, finalize their divorce, obtain an order of protection, and have no contact with her.

11

She acknowledged that Joseph indicated that he filed for divorce in August 2023 but noted that she had been unable to confirm this. She further noted that Joseph applied for another order of protection against Chrystal, who was served with process in May 2025.

¶ 43    On cross-examination, Leeds testified that at the time of the hearing, Chrystal was living in a halfway house in Chicago and indicated that she intended to remain in Chicago. She noted that Joseph continued to live in Decatur. She further testified that Joseph had been cooperative with services. She clarified her earlier testimony concerning the results of drug tests, noting that Joseph had not tested positive for illegal substances since 2023, although she did not specify a month. Finally, Leeds acknowledged that when the children were returned to Joseph's care in March 2023, her agency recommended closing the cases for Heavenly and Josiah and leaving Skylar's case open under supervision.

¶ 44    Joseph testified on his own behalf. He first stated that he took all the classes and completed all the services asked of him. Asked if he felt he benefited, Joseph replied, "Yes. All of them besides the healthy relationship class." He explained that the person running the class played videos and asked him how his day was but did not discuss the material.

¶ 45    Joseph testified that he was last incarcerated in the Department of Corrections in 2017. He acknowledged that in the past, he "was a real bad addict" despite being able to hold a job. He testified that his addiction was now under control after he completed treatment.

¶ 46    Joseph acknowledged that his relationship with Chrystal was not a healthy one. Asked why he dropped an earlier order of protection he had obtained against her, he replied, "I wanted to keep my family together. So, I contacted her and asked if she would stay sober, and she said that she would. Well, I found out 12 hours out, she didn't." He further testified, "I was actually going to tell on myself at that time but I didn't want to lose my kids." Joseph testified that he obtained a

new order of protection against Chrystal in May 2025. He further testified that he filed for divorce in 2023. When asked why he did not follow through, he explained that he was unable to serve Chrystal with the petition at that time because she was in jail.

¶ 47 Joseph testified that he was willing to do whatever it took for his children to be returned to his care. He stated that he was now "serious about leaving Chrystal alone," partly because he learned that she cheated on him and partly because he realized she could not stay sober.

¶ 48 After hearing arguments, the court announced its ruling from the bench. The court first found "the timeline, as set forth by Ms. Leeds, particularly significant." The court explained that the case involves a "troubling history" with a "cycle of removing the children and putting them back and removing them and then having the domestic violence issue, specifically, come back again and again." The court emphasized that this pattern, along with Joseph's decision to allow Chrystal to move back into his home, established "an ongoing failure to successfully address the reasons for removal."

¶ 49 The court next addressed the specific grounds of unfitness alleged by the State, beginning with the allegations that both parents failed to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare. The court found this allegation proven with respect to both parents, explaining that the totality of the evidence showed a pattern of not taking the necessary steps to protect the children from the domestic violence at issue.

¶ 50 The court next addressed the allegations that both Joseph and Chrystal failed to make reasonable efforts to correct the conditions that led to the children's removal. The court noted that this ground is measured by a subjective standard, with a focus on "actual efforts to correct the conditions" and whether those efforts are reasonable. The court found that the State met its burden of proving that both parents failed to make reasonable efforts.

¶ 51    The court next considered the allegations of failure to make reasonable progress towards the children's return. The court found that the State failed to satisfy its burden of proof with respect to the nine-month period between October 26, 2023, and July 26, 2024. However, the court found that because the children were not "anywhere in the close vicinity of being returned home," the State met its burden of proving by clear and convincing evidence that both parents failed to make reasonable progress between March 12, 2024, and December 12, 2024.

¶ 52    Finally, the court considered the allegations that both parents were unfit due to depravity. The court found that Joseph successfully rebutted the presumption of depravity arising from his prior convictions, but that Chrystal did not rebut the presumption.

¶ 53    In docket entries dated June 16, 2025, the court expressly found both parents unfit. The court also reiterated its oral findings with respect to each ground of unfitness the State alleged.

¶ 54    The court held a best interest hearing on August 6, 2025. Caseworker Gailan Leeds again testified for the State. She stated that the three children were placed together in the same foster home. She explained that the foster family was considered fictive kin due to the existence of an established bond because they were previously placed in the same home. Leeds testified that all three children were doing well in their foster home and shared a bond with their foster parents. Heavenly showed affection for her foster parents and called them Mom and Dad. According to Leeds, Heavenly told caregivers at her school that she was afraid of being separated from her foster parents. Josiah likewise called his foster parents Mom and Dad. Both Heavenly and Josiah were excited to see their foster parents when they were returned to the foster home in October 2024.

¶ 55    Leeds stated that when she asked Heavenly where she wanted to live, Heavenly told her she wanted to live with her foster mother, but she also indicated she liked visits with her father. Leeds noted that Josiah and Skylar were too young to express an opinion as to their preferences.

14

Leeds believed it was in the best interests of the children to terminate Joseph and Chrystal's parental rights.

¶ 56    On cross-examination, Leeds testified that she supervised Joseph's visits with the children after they were removed from his home in October 2024. Based on her observations, she believed the children had a bond with him. She further testified that when the children were in Joseph's care, he was willing to meet their needs, including doing what was necessary for them to receive counseling or individualized education plans at school.

¶ 57    Joseph's sister, Susie A., testified on his behalf. Susie saw Joseph and the children "[p]retty often." In her opinion, he was "a good father." She observed a bond between Joseph and the children, and she believed he was ready to cut his ties to Chrystal.

¶ 58    The next witness was Hannah A., Joseph's 18-year-old daughter from a previous relationship. Although Hannah lived primarily with her mother, rather than Joseph, from the time she was nine years old, she saw Joseph and his younger children every weekend. She testified that Joseph and the children had a bond and a good relationship. She did not believe it was in the best interest of her younger siblings for Joseph's parental rights to be terminated.

¶ 59    On cross-examination by the guardian *ad litem*, Hannah testified that Joseph and Chrystal argued frequently. She stated, however, that their arguments did not take place in front of the children, explaining that they were with her in her bedroom where they could not hear their parents arguing. Hannah further testified that Joseph told Chrystal to leave when she behaved in a manner that upset the children.

¶ 60    Joseph then testified on his own behalf that he filed a petition for an order of protection against Chrystal in April 2025, but he stated that due to difficulty in serving her with the petition, the court had issued only an emergency order of protection. He likewise testified that he filed for

dissolution of marriage in 2023, but that case was still in limbo because he was unable to locate Chrystal to "get her subpoenaed."

¶ 61 Joseph further testified that he had a bond with his children. He noted that at his last supervised visit with the children, they refused to get into the car with the caseworker supervising the visit because they did not want to leave. Joseph did not believe termination of his parental rights was in their best interests. He acknowledged, however, that there were still things he needed to "work on" before they could be returned to his care.

¶ 62 On cross-examination, the State asked Joseph what he still needed to work on. He replied, "Healthy relationships is a big one. As you guys know from my last court date, I wanted to keep my family together, but the more information I gathered, I don't want to be with her anymore." He testified that he also needed to complete counseling.

¶ 63 Joseph's final witness was Abby McKinney, a case aid with Lutheran Child and Family Services. McKinney testified that she supervised six visits with Joseph and the children. Based on her observations, there was a bond between Joseph and the children, and the children appeared happy to see him. She stated, "They love each other very much."

¶ 64 After hearing arguments, the court found that the State met its burden of proving termination of both parents' rights was in the children's best interests. The court noted that the length of time the case had been pending was a "very significant" factor in its decision. Next, the court addressed some of the best interest factors it deemed relevant. With respect to the children's physical safety and welfare, the court noted that all their needs were being met in their current placement. Regarding the children's sense of attachment and sense of security, the court found that allowing them to remain in their current home with their foster parents was the "least disruptive placement" for them. The court further noted that the oldest child, Heavenly, wanted to stay in her

16

foster home. Finally, the court stated that the children's need for permanency favored their current placement, and the court indicated it placed "a lot of emphasis" on this factor.

¶ 65     On the same date, the court entered permanency orders in all three cases changing the goal to adoption. The court entered written orders terminating Joseph and Chrystal's parental rights on August 19, 2025. In the written orders, the court found that the State proved all its allegations of unfitness by clear and convincing evidence,[2] and further found that termination of parental rights was in the children's best interests. This timely appeal followed on September 3, 2025.

¶ 66                                        II. ANALYSIS

¶ 67     Joseph argues that (1) the trial court's findings of unfitness on all four asserted grounds were against the manifest weight of the evidence and (2) the trial court's best interest finding was against the manifest weight of the evidence. We disagree.

¶ 68     Before considering these contentions, we will briefly address the inconsistency between the trial court's oral unfitness findings and the findings of unfitness in the written termination order it entered two months later. Where a court's oral rulings conflict with its subsequent written order, it is the oral findings that prevail. *In re Mar. S.*, 2023 IL App (1st) 231349, ¶ 37; *In re R.W.*, 371 Ill. App. 3d 1171, 1173 (2007). Thus, although the written termination order indicates that the State met its burden of proving Joseph unfit on all four asserted grounds, the court's oral pronouncement finding that he successfully rebutted the presumption of depravity constitutes the court's ruling on that issue. As such, we need not address Joseph's argument concerning the trial court's finding of unfitness on the ground of depravity. With this in mind, we turn our attention to the remainder of Joseph's contentions.

---

[2]We note that this finding conflicts with the court's earlier written and oral findings that Joseph rebutted the presumption of depravity and the State failed to meet its burden of proof with respect to one of the two nine-month periods it identified for both parents' failure to make reasonable progress toward the children's return.

17

¶ 69                                    A. Unfitness

¶ 70    Termination of parental rights involves a two-step process. First, the State must prove that the respondent parent is unfit by clear and convincing evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 62. If the trial court finds a parent unfit, the proceedings progress to the second step, during which the State must prove by a preponderance of the evidence that termination of parental rights is in the children's best interests. *Id.* ¶ 73.

¶ 71    We give great deference to the trial court's unfitness findings because that court had the opportunity to observe and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). As such, we will reverse a finding of unfitness only if it is against the manifest weight of the evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 63. A decision is against the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 72    Here, as we have discussed, the trial court found Joseph unfit on three grounds: (1) failure to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) failure to make reasonable efforts to correct the conditions that led to the children's removal during any nine-month period following the adjudication of neglect or abuse (*id.* § 1(D)(m)(i)); and (3) failure to make reasonable progress toward the return of the children during any nine-month period following the adjudication of neglect or abuse (*id.* § 1(D)(m)(ii)). Because a parent may be found unfit if the State proves any one of the statutory grounds for unfitness by clear and convincing evidence, we will affirm the trial court's decision if the evidence supports its finding as to any of these grounds. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶¶ 63-64.

18

¶ 73    In considering whether a parent is unfit for failing to maintain a reasonable degree of interest, concern, or responsibility for the welfare of the children, our "focus is on the parent's reasonable efforts more so than the parent's success." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 36. Thus, we must take into account circumstances that made it difficult for the parent to demonstrate the requisite reasonable degree of interest, concern, or responsibility. *Id.* Significantly, however, a parent cannot avoid a finding of unfitness by showing *some* interest, concern, or responsibility; the question is whether the parent's interest, concern, or responsibility is *reasonable*. *In re M.I.*, 2016 IL 120232, ¶ 30. Inconsistent visitation and failure to complete required services are sufficient to support a trial court's finding of unfitness on this ground. See *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33 (citing *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24). In addition, because the statutory language is disjunctive, any of the three elements may provide a basis for a finding of unfitness standing alone. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 36. That is, a parent may be found unfit for failing to maintain a reasonable degree of interest or concern or responsibility. *Id.*

¶ 74    Failure to make reasonable efforts to correct the conditions that brought the children into care and failure to make reasonable progress toward their return are two distinct grounds for parental unfitness. *In re Daphnie E.*, 368 Ill. App. 3d at 1066. We assess a parent's reasonable efforts by a subjective standard based on the amount of effort that is reasonable for the particular parent. *Id.* at 1066-67. By contrast, we measure reasonable progress by an objective standard. *Id.* at 1067. The benchmark for measuring reasonable progress includes "compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001).

19

"At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." *In re Daphnie E.*, 368 Ill. App. 3d at 1067. A parent has made reasonable progress when the circuit court, "in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 75 Here, there was no evidence that Joseph failed to attend visits with the children consistently, and there was no evidence that he engaged in any acts of domestic violence after an incident that occurred in August 2021. In addition, undisputed evidence showed that he complied with his service plans. Nevertheless, the evidence also showed that Joseph repeatedly failed to protect the children from the presence of his estranged wife, Chrystal, which resulted in the children being removed from his care after they had already been in and out of foster care multiple times. In addition, Joseph acknowledged that by the time of the hearings, there were still problems he needed to address before the children could be returned to his care. At that point, Heavenly's case had been open for five years. "A parent does not have an unlimited period of time in which to make reasonable efforts or progress toward regaining custody of their children." *In re Grant M.*, 307 Ill. App. 3d 865, 871 (1999).

¶ 76 Further, Joseph's acknowledgement is consistent with the caseworker's testimony that it would not be safe to return the children to his care in the near future. As we have already explained, reasonable progress exists when the trial court will be able to return the children to the parent's custody "in the *near future*." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d at 461. Thus, even assuming Joseph demonstrated a reasonable degree of interest, concern, and responsibility for the children's welfare and made reasonable efforts to correct the conditions that led to their removal from his home, the evidence is more than sufficient to support the court's finding that he was unfit for failing to make reasonable progress towards their return.

20

¶ 77    In support of his argument to the contrary, Joseph points out that a parent cannot be found unfit for failure to perform actions or take steps he was never told were required of him. *In re R.B.*, 297 Ill. App. 3d 97, 101 (1998); *In re T.D.*, 268 Ill. App. 3d 239, 247 (1994); see also *In re Charlie V.*, 2025 IL App (5th) 241085-U, ¶ 28; *In re K.G.*, 2023 IL App (5th) 230148-U, ¶ 32.[3] Although this argument correctly states the law, we do not believe that is what occurred in this case.

¶ 78    Joseph highlights the testimony of caseworker Leeds that before the children could be returned to his care, he would need to put physical distance between himself and Chrystal, obtain an order of protection against her, and finalize his divorce. He argues that the record is devoid of any evidence he was ever told these were requirements. We are not persuaded.

¶ 79    Joseph argues that what occurred in this case is analogous to what occurred in the case of *In re R.B.*, where the appellate court reversed a finding of unfitness based on the respondent mother's failure to separate from her substance-abusing husband. *In re R.B.*, 297 Ill. App. 3d at 101. We find *In re R.B.* distinguishable from the case before us.

¶ 80    There, as in this case, the children were removed from their home due, in part, to substance abuse by both parents. *Id.* at 98. Two years later, the State sought to terminate the parental rights of both parents. *Id.* The trial court found the mother unfit for failing to make reasonable efforts to correct the conditions that led to the children's removal and failure to make reasonable progress toward their return. *Id.* at 99. In making this finding, the trial court expressly stated that, although the mother no longer had a substance abuse problem, the father did. *Id.* The trial court thus concluded that she did not make reasonable progress or efforts to correct one of the conditions that led to the removal of the children—the presence of a substance abuser in the home. *Id.*

---

[3]We cite *In re Charlie V.* and *In re K.G.* as persuasive authority pursuant to Illinois Supreme Court Rule 23(e)(1) (eff. Jan. 1, 2021).

¶ 81    At the best interest hearing, the trial court further clarified its earlier finding of unfitness, explaining that it found the mother unfit based on her refusal " 'to make a choice for her children and against her husband.' " *Id.* However, the only evidence that the mother was ever warned she must leave her husband or risk termination of her parental rights was the testimony of her therapist, who testified that during counseling, she told the mother that if the father continued his substance abuse, the therapist "could not 'predict a time at which DCFS is likely to allow' the children to live with them again." *Id.* at 101.

¶ 82    On appeal, the reviewing court found that this comment by the mother's therapist did not constitute a specific warning that her parental rights might be terminated if she did not leave her husband. *Id.* In this context, the appellate court concluded that the mother "should not have been found to be an unfit parent based upon her failure to perform an act that she was never told she was required to do." *Id.*

¶ 83    The record in this case stands in stark contrast to the circumstances of *In re R.B.* Here, Joseph and Chrystal separated more than two years before the State sought to terminate their parental rights, and they informed their caseworker of their intent to end their marriage at that time. Despite evidence that Joseph's caseworkers told him multiple times that Chrystal was not permitted to have unsupervised visitation with the children, he allowed her to return to his home while they were in his custody. Joseph's testimony that he did not "tell on [himself]" by informing his caseworker that he allowed Chrystal to move back in with him in October 2024 for fear of losing his children confirms that, unlike the mother in *In re R.B.*, he was well aware of that possibility.

¶ 84    Moreover, we do not believe the trial court's ruling in this case was based solely on his failure to take more concrete action to end his marriage to his already-estranged wife or any other

22

specific step. Rather, the issue was his ongoing failure to prevent Chrystal from having access to the children. Leeds testified that Joseph dropped an order of protection he previously obtained against her, and the evidence established that Joseph allowed Chrystal to move back in with him even though he already had a pending dissolution case. In addition, Joseph acknowledged that he did not feel he learned anything from his healthy relationships class, a service he needed to complete and put into practice in order to regain custody of his children. We find no support for Joseph's position in *In re R.B.* and conclude that the trial court's finding of unfitness was supported by the evidence.

¶ 85                                       B. Best Interests

¶ 86    Once the trial court finds a parent unfit, the focus shifts to the child. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 73. During the best interest phase, the parent's interest in maintaining a relationship with the child "must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004).

¶ 87    In deciding whether termination of parental rights is in a child's best interests, the trial court must consider the following statutory factors: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural, and religious background and ties; (4) the child's sense of attachment; (5) the child's wishes; (6) the child's community ties; (7) the need for permanence and stability and the continuity of the child's relationships with parental figures, siblings, and other family members; (8) the uniqueness of each child and family; (9) the risks inherent in substitute care; and (10) the preferences of the individuals available to provide care. 705 ILCS 405/1-3(4.05) (West 2024). Although the court must consider all applicable statutory factors, it is not required to refer to each individual factor in rendering its decision. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

23

¶ 88    As with the trial court's unfitness finding, we review its best interest finding to determine whether it is against the manifest weight of the evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 74. As stated previously, this occurs "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 89    Joseph argues that the trial court's finding was contrary to the manifest weight of the evidence because the majority of the statutory best interest factors weigh against termination of his parental rights. We disagree.

¶ 90    Here, the trial court expressly stated that it placed significant emphasis on the children's need for stability and permanence. See 705 ILCS 405/1-3(4.05)(g) (West 2024). In view of the history of the children being returned home repeatedly, only to be removed again when aftercare failed, we agree with the court that this factor weighed heavily in favor of termination. Heavenly's expressed preference for remaining with her foster parents likewise weighed in favor of termination. See *id.* § 1-3(4.05)(e). In light of Joseph's failure to keep the children away from Chrystal and the injurious environment she created, we likewise agree with the court that the children's physical safety and welfare was also a factor that weighed in favor of termination. See *id.* § 1-3(4.05)(a).

¶ 91    Joseph argues that many of the other factors weigh against termination because the children lived with him for a greater period of time than they lived with their foster parents. However, the evidence demonstrated that the children all had strong bonds with both their foster parents and with Joseph. Thus, the children's sense of attachment (*id.* § 1-3(4.05)(d)) did not weigh heavily in either direction. In addition, there was no evidence concerning factors such as the children's cultural and religious background or their ties to the community. Moreover, as a reviewing court,

24

we do not reweigh the evidence or retry the case. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. Viewing the evidence as a whole in light of the deference we must give the trial court, we cannot find its decision to be against the manifest weight of the evidence.

¶ 92                                    III. CONCLUSION

¶ 93    For the foregoing reasons, we affirm the orders of the circuit court terminating respondent's parental rights.


¶ 94    Affirmed.